## UNITED STATES *v.* WATERHOUSE (No. 119).[1]

1. MIXED GOODS THAT MAY BEAR DIFFERING RATES OF DUTY.

Dutiable goods imported mixed with other goods subject to another rate of duty or none at all, if practicably separable or if determinable in quantity may, on a levy of duties, be segregated for that purpose.—United States *v.* Ranlett (172 U. S., 133).

2. COAL SLACK OR CULM THAT WILL PASS THROUGH A HALF-INCH SCREEN.

The term " coal slack or culm," appearing in paragraph 415, tariff act of 1897, may not be taken as employed there in a commercial sense limiting the words to coal screened at the mines, but applies as well to coal screened on entry at a port of entry; and coal having been so screened here, the coal slack or culm resulting from the process was dutiable under the act named at 15 cents per ton of 28 bushels, 80 pounds to the bushel.

### United States Court of Customs Appeals, March 27, 1911.

TRANSFERRED from United States Circuit Court for Western District of Washington, Northern Division, G. A. 6923 (T. D. 29915).

[Affirmed.]

*D. Frank Lloyd*, Assistant Attorney General (*Thomas M. Lane* on the brief), for the United States.

*W. H. Bogle* for appellees.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

SMITH, Judge, delivered the opinion of the court:

In the month of September, 1908, the barge *Quatsino*, from Nanaimo, and the barge *Two Brothers*, from Ladysmith, British Columbia, laden with coal, arrived at the subport of Seattle, State of Washington. The *Quatsino* discharged at the Chesley Dock 427,443 pounds of coal, of which 53,625 pounds, or 12.55 per cent, passed through a half-inch screen. At the Wellington Dock there was discharged from the same vessel 805,276 pounds of coal, of which 145,577 pounds, or 18.08 per cent, passed through a half-inch screen *after two screenings*. The *Two Brothers* discharged at the Chesley Dock 4,480,306 pounds, of which 497,857 pounds, or 11.1 per cent, passed through a half-inch screen.

The collector of customs assessed all the coal, independent of whether it passed over or through the half-inch screen, at 67 cents a ton under the provisions of paragraph 415 of the tariff act of July 24, 1897, which in part reads as follows:

415. Coal, bituminous, and all coals containing less than ninety-two per centum of fixed carbon, and shale, sixty-seven cents per ton of twenty-eight bushels, eighty pounds to the bushel; coal slack or culm, such as will pass through a half-inch screen, fifteen cents per ton of twenty-eight bushels, eighty pounds to the bushel. * * *

The importers protested that a portion of the coal was not assessable at 67 cents per ton, but that it was dutiable at 15 cents per ton as

---

[1] Reported in T. D. 31452 (20 Treas. Dec., 588).

"coal slack or culm such as will pass through a half-inch screen." The Board of General Appraisers held that that part of the importation which passed through a half-inch screen on a *single screening* was coal slack assessable at 15 cents per ton and directed the collector to reliquidate the entries accordingly. The Government appealed.

In coal mining, the coal is generally either shattered in the bed or seam by blasting or broken up by undercutting. It is then dislodged by picking or by some mechanical process and finally shoveled or otherwise loaded into small cars for transportation to the surface. From these processes in coal production it necessarily follows that the coal is broken into pieces varying in size from large chunks to small bits and that mixed with the coal as it comes from the mine is a percentage of coal dust, dirt, and generally slate or other rock more or less reduced in size. The larger pieces of foreign material, as far as may be practicable, are removed, and what remains is ordinarily screened at the mine for the purpose of securing the merchantable coal. At most mines not less than two screens are used, one with a 2½-inch or 3-inch aperture and one with a half-inch aperture. The coal which passes over the larger screen is known as lump coal and that which passes through it but fails to pass through the smaller screen is called nut coal. Some mines use a third screen, which catches a size of coal known as pea coal. But whether two screens or more than two screens are used, that which passes through the screen with the smallest opening is known as "slack" or "mine slack" and is made up largely of pieces of coal of undesirable size, coal dust, dirt, particles of slate, or other matter.

From the testimony of the witnesses it appears that this slack or mine slack is considered as refuse and is thrown on the dump as waste. What use to make of this slack or waste has long been a puzzle, and certainly until very recent years it was not considered commercially available as a separate product. Indeed, there is direct testimony to the effect that even now there is but little trade in mine slack, and that as a distinct entity it is rarely imported. At the present time, when sold at all, mine slack brings a small price, say from 25 cents to 50 cents a ton f. o. b. at the mines of British Columbia and 65 cents to $1.50 a ton at Seattle.

After the screening of the coal, that which has passed over the larger screens is carried to the bunkers and thence by chutes or conveyors is shot into vessels or cars for transportation to market. The screening of the coal at the mines, the carrying of the same to the bunkers, the loading of it into vessels or cars, the motion of the vessel or cars on the voyage or journey, and the shock and friction caused by unloading at the point of destination to some extent again breaks up the coal and develops from 12 to 15 per cent of coal dust or dirt, small pieces of coal, and probably other matter which will pass through a half-inch

screen. This is the product which has given rise to the present controversy, the Government contending that it should be assessed for duty at 67 cents per ton as coal, and the importers insisting that it should be classified as coal slack, dutiable at 15 cents per ton. The Government's contentions in support of its claim may be reduced to two. First, that only mine screenings are commercially known as "slack," and that screenings developed by other than mining operations are not known to the trade as "slack," but as "screenings," or as "steam coal." Second, that "slack" must be imported *as such*, and that the fine particles which are incident to all importations of lump coal in bulk can not be segregated and given a rate of duty different from the main importation.

William E. Pearce, in the coal business since 1897; C. R. Claghorn, in the coal business since 1884; and Dexter Shoudy, wholesale dealer in coal for 17 years, witnesses for the Government, testified that only mine screenings were known as "slack" and that screenings made at destination were known to the coal trade as "screenings." As against this, however, we have the testimony of two other Government witnesses, Lee P. Ketcham and John William Bullock. Lee P. Ketcham, in the coal business for 15 years, responding to a question as to whether "slack" was not a term used only in and about mines and "screenings" the term used in the retail trade, testified that *both* terms were used in the retail trade. John William Bullock, 7 years in the coal business, testified as follows:

Q. According to your experience, how much screenings, on the average, of the size just mentioned, would be found in any carload of bituminous coal? What percentage would be found?—A. Of slack, do you mean?

Q. Of screenings.—A. Do you mean if weighed here?

Q. Weighed at the point of destination—how much per cent?—A. Ten per cent.

Q. You would consider, then, that 10 per cent would be the average amount for merchantable coal?—A. Yes. On the large ton of 2,240 pounds it figures about that we get 2,000 pounds of coal. There would be about 240 pounds of screenings.

⁂

Q. What do you mean by the term "slack?" Is that the name you apply to the 240 pounds of refuse that you find in this ton of coal on its arrival at destination?—A. I mean by slack all the small coal that goes through the screens at the bunkers.

Q. Do you say that the term is applied to the small coal taken out at destination by screening? Is that a slip of yours or do you use the term advisedly?—A. Well, all the small coal that comes from the screen—we call that slack or waste—generally.

Q. The small coal that passes through a half-inch mesh here, do you call that slack?—A. Yes.

Q. Is that the term generally understood in the trade as covering that product, or is it not screenings?—A. It is the screenings.

Q. Then why do you use the term slack?—A. Some call it slack and some call it screenings. Some use one term and some another. The two terms are used interchangeably.

In view of this testimony and of the fact that none of the witnesses pretended to say that there was any trade understanding of the word

"slack" at or before the time it was used in the statute, we think that the Government has failed to make out that the word "slack" is a commercial designation or that it has a definite, uniform, or general trade meaning as distinguished from its ordinary signification. We are therefore remanded to the common meaning of the word, and that we find to be, according to the dictionaries, as follows:

Webster's International Dictionary:

*Slack.*—Small coal; also coal dust; culm.

Standard Dictionary:

*Slack.*—A small coal; coal dirt or screenings.

Century Dictionary:

· *Slack.*—The finer screenings of coal; coal dirt; especially the dust of bituminous coal. Slack is not considered a marketable material, but may be, and is more or less, used in making prepared or artificial fuel.

Murray's Dictionary:

*Culm.*—Soot, smut. Coal dust, small or refuse coal, slack. Applied to the slack of anthracite or stone coal from the Welsh collieries, which was in common use for burning lime and drying malt.

Worcester's Dictionary:

*Slack.*—Small coal; coal broken in parts smaller than the size of an egg.

Analyzing these definitions and reconciling them one with the other, it is evident that the small coal, coal dust, and coal dirt screened from the larger material is "slack," and that it was so considered by the Treasury Department seems clear from its decisions which, by the way, did not question the meaning of the word, but held to the position that "slack" could not be permitted to enter at the lower rate when it was not imported as "slack" and came in mixed with the lump or other coal of the general cargo. (See T. D. 604, T. D. 667, T. D. 2363, and T. D. 6225.) None of the definitions, except possibly that of Murray, even inferentially confines the term "slack" to mine screenings. Undoubtedly "slack" was *originally* a term invented by miners to designate the screenings resulting from mining operations—the screenings which were cast aside as unmarketable waste and refuse. In time, however, the word seems to have had such a general use as to have found its way into the dictionaries with a meaning which distinguished coal proper from coal screenings irrespective of the place of their production. In other words, screenings, whether made at the mines or elsewhere, being similar in appearance and apparently of the same general composition, the popular mind quite naturally applied the same name to both.

That Congress used the word in its dictionary rather than in its mining sense appears to be borne out by the fact that when it was first used in a tariff law, about 40 years ago, the utilization of "mine slack" was still a problem, and its importation as a separate article must have been commercially impracticable. In fact, counsel for the

Government, making his deductions from cases cited and speaking of the products known as "slack" or "culm," says:

They are so nearly worthless as they fall through the screens that they are not regarded as "coal" under royalty agreements in leases and grants of coal lands.

A product so useless at home could hardly have engaged the attention of Congress as a likely article of importation from abroad. In our opinion what *did* engage the attention of Congress was the "slack" which came into the United States with "run of the mine" and other importations of coal. The fact that such slack, an inferior coal, if coal it could be called, was compelled originally to pay the same duty as the superior commodity probably gave rise to complaints which finally brought about the legislative discrimination between the coal which passed over a half-inch screen and the coal, coal dust, and dirt which went through it.

The second contention of the Government that slack must be imported as such and that it can not be segregated from importations of lump coal for tariff purposes is to some extent answered by what has already been said. In our opinion, Congress, at the time it provided a low duty for "slack," never contemplated that it would be brought in as a separate, distinct article of commerce. The lawmaking power was confronted, we think, not with the possible commercial availability at some future time of "slack" as a distinct article, but with the plain, common, practical business proposition that "slack" was a necessary incident to the importation of both "run of the mine" coal and screened at the mine coal, and that the importer was virtually penalized for its presence by paying duty on it as coal. Congress, therefore, we believe, fixed a duty of 15 cents per ton on slack coal as a relief measure and fully intended that coal and slack coal should be separately assessed and admitted at different tariff rates.

Counsel for the Government, however, insist that for nearly 30 years the Treasury Department ruled that no such segregation could be made and invokes as legislative confirmation of that construction the substantial reenactment in the tariff act of 1897 of previous provisions for "slack." In May, 1870, in July, 1875, and in March, 1884, the Treasury Department did so rule and virtually held that slack was not entitled to the lower rate unless it came in unmixed appreciably "with other coal" and was shipped and invoiced from the foreign country as "slack." In February, 1893, the Board of General Appraisers (T. D. 13816) approved the ruling of the Department and held that—

Congress in providing for coal culm in the present act had knowledge of the interpretation placed upon the language of prior statutes by the Treasury Department relative to bituminous and culm coal, and gave legislative sanction to such a construction of the statute by the choice of language contained in paragraph 432, N. T.

In June, 1900, the board in Abstract 1800 (T. D. 25361) held directly to the contrary. In that case the segregation of the importation was

permitted and the collector was directed to classify a part of the cargo as slack or culm. An appeal having been taken from this decision, it was *reversed by agreement of the parties* on June 15, 1909. The present case was decided on July 16, 1909, and held to the views declared in T. D. 25361. On January 17, 1905, the board in Abstract 4457 (T. D. 25991) and in the Bond case, Abstract 4458 (T. D. 25991), again held that the importation was segregable and that the slack found was dutiable at 15 cents per ton. The Bond case was appealed to the Circuit Court for the Southern District of Texas and that court affirmed the decision of the board. The following is the opinion of the court:

BURNS, *District Judge:* This case arises upon petition to review the action of the Board of General Appraisers in sustaining the protest of the importer against the assessment of duty upon certain bituminous coal, imported through the port of Galveston on the 6th day of September, 1904.

Entry was duly made of 175 tons, described as "surplus bunkers" and invoiced as bituminous coal; duty thereon was assessed under paragraph 415 of the tariff act of July 24, 1897 (c. 11, sec. 1, Schedule N, 30 Stat., 190; U. S. Comp. St., 1901, p. 1674), at 67 cents per ton; and the entry was liquidated in accordance therewith. This action upon the part of the collector of customs was but the exercise of sound discretion, and he was, in the light of the Treasury decisions, without the alternative to give the matter other direction. The importer contends that 35 per cent of said coal is found to be "slack or culm," and under said paragraph 415 subject to duty at 15 cents per ton. The acting appraiser makes the following return:

I took a fair representative sample of 113 pounds, used a half-inch screen, and with the following result:

|                    | Per cent. |
|--------------------|-----------|
| Slack, 40½ pounds  | 0. 35481  |
| Lump, 72½ pounds   | . 64159   |

Petitioner contends that a fair interpretation of the tariff clause relating to the duty upon bituminous coal has no application to slack or culm, where the latter is a part of and not segregated from the general cargo; that, to make the rate of 15 cents per ton available to the importer, the slack or culm must be an individual importation in the sense that it must be distinct, separate, and not confused and intermingled with bituminous coal carrying a higher rate of assessment; and that, not being so separated and segregated, the higher rate should attach. The contrary view is announced by the Board of General Appraisers. It is found as a fact that of the coal in question 35 per cent thereof is what is commonly known as "slack;" and upon the test, made, so far as this record speaks, in a fair and proper way, there appears to be no difficulty upon the part of those charged with the assessment and collection of the duty in ascertaining the proportion which the slack bears to the lump, the part to the whole.

Hence it follows that, if a correct result can be had by the use of scale and screen, the object and purpose of the law has been attained—the quantity of each grade or class ascertained. And, this being so, the law will neither require nor invite the importer to perform an act of separation, useless in result and burdensome in cost, when, as in this case, it appears that the quantity of coal and slack can be estimated and fixed by the weighing of a single tub.

The action of the board should be in all things affirmed, with directions to the collector to reliquidate the entry in accordance with the views here announced, and the decree will so provide.

From these decisions it would seem that the tribunals charged with the duty of reviewing customs classifications have not considered that the act of 1897 was confirmatory of the Treasury construction touch-

ing the nonsegregable character of coal importations and that the interpretation of the statute was not foreclosed by administrative practice. Indeed, a definite duty having been fixed by law on a definite article, it is extremely doubtful whether mere administrative practice in the absence of statutory authority can attach to it a higher rate simply because it is mixed with other merchandise from which it is admittedly separable and for which separation the law itself seems to have made provision.

That dutiable goods, specifically named, coming in mixed with others bearing another rate of duty or entitled to free entry and practicably separable can be segregated seems to have been finally decided in the case of United States *v.* Ranlett (172 U. S., 133). In that case, so far as examined by the customs examiner, from 20 to 25 per cent of American bags entitled to free entry came in mixed with 75 to 80 per cent of foreign bags which were dutiable. Due to this mixture of dutiable and nondutiable bags the appraiser reported all the bags as dutiable, and the collector so assessed them. The Supreme Court decided that one-fourth of the duties paid should be refunded. Prior to the Ranlett case the principle of segregation therein enunciated seems to have been recognized both by the board and the courts. See United States *v.* Brewer (92 Fed. Rep., 343); Weil *v.* United States (115 Fed. Rep., 592); United States *v.* Helmrath (135 Fed. Rep., 912); United States. *v* Myers (140 Fed. Rep., 648). The case of the United States *v.* Myers is of especial value as showing the judicial tendency to permit of the assessment of mixed goods carrying different rates of duty. In that case wood pulp subject to a countervailing duty was mixed with wood pulp which was not subject to such duty. The court, affirming the Board of General Appraisers, held that inasmuch as the percentage of it subject to countervailing duty could be established, although the pulp could not be segregated, separate duties might be imposed.

The argument that the segregation of the importation and the assessment of the screenings at 15 cents per ton really amounts to a damage allowance for coal injured during the voyage by loading and unloading is not well founded. Congress, recognizing that slack would be a necessary result and constitute no inconsiderable part of every importation of coal, provided for its segregation and imposed upon it a different rate of duty. If "slack" had not been named and provided for, and if Congress had not indicated the means by which its quantity could be determined, the contention that slack was really damaged coal and that no allowance could be made for it might be entitled to serious consideration.

Duties should be reliquidated as directed in the decision of the Board of General Appraisers, which is *affirmed.*

MONTGOMERY, Presiding Judge, and HUNT, BARBER, and DE VRIES, Judges, concur.