UNITED STATES *v.* WELLS, FARGO & CO. (No. 29).[1]

1. "UNWROUGHT," MEANING OF.

   Words and phrases in customs laws are employed in view of a lay understanding and are accordingly assumed to be used with their natural signification; so construed "unwrought" in the phrase "metals unwrought" can not be taken to mean the presence of specific attributes in the metal—of malleability in the metal, for example.

2. LEGISLATIVE INTERPRETATION.

   The Congress by tariff act of 1909, having placed rhodium specifically on the free list, must be taken inferentially to have intended theretofore to declare rhodium a dutiable article.

3. RHODIUM.

   Rhodium is a metal and unwrought and as such was dutiable under paragraph 183, tariff act, 1897.

United States Court of Customs Appeals, January 11, 1911.

TRANSFERRED from United States Circuit Court for Southern District of New York, Abstract 17223 (T. D. 28481).

*D. Frank Lloyd*, Assistant Attorney General (*Charles Duane Baker* on the brief), for the United States.

*D. Macon Webster* for the appellees.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

DE VRIES, Judge, delivered the opinion of the court:

This action concerns rhodium. The collector of customs at the port of New York, upon an advisory classification from the appraiser

---

[1] Reported in T. D. 31211 (20 Treas. Dec., 77).

at that port, assessed it for duty as a "metallic mineral substance, crude," at 20 per cent ad valorem, under the provisions of paragraph 183 of the tariff act of 1897, which reads:

Metallic mineral substances in a crude state, and metals unwrought, not specially provided for in this act, twenty per centum ad valorem; monazite sand and thorite, six cents per pound.

The appraiser reported it as "metallic rhodium" and advised the classification above given, which was adopted by the collector.

The appellee, then protestant, made claim that rhodium is a platina metal and free of duty under the tariff act of 1897, either under the provisions of paragraph 642 of the free list, which reads:

Platinum, unmanufactured, and vases, retorts, and other apparatus, vessels, and parts thereof composed of platinum, for chemical uses.

Or under paragraph 631, which reads:

Palladium.

Or under paragraph 583, which reads:

Iridium.

Or under paragraph 614, as a "mineral ore," which reads:

Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for in this act.

And further alleged that if assessed at all for duty it should be at the rate of 10 per cent under section 6 of that act as an unenumerated unmanufactured article.

On appeal to the Board of General Appraisers the protest was sustained and the decision of the collector reversed, the board basing its finding upon a previous decision of the board, and stated:

As we held in the previous decision of the board this rhodium is not a metallic mineral, *it is a pure metal*, and not a metal in combination, mechanical or otherwise, with a mineral substance. *It is not a metal unwrought* in view of the ruling in United States *v.* Roessler & Hasslacher Chemical Co. (137 Fed. Rep., 770). * * *

At the hearing before the Board of General Appraisers testimony was adduced on behalf of both the importer and the Government. From the record and matters within judicial cognizance of the court it is established that rhodium is what is characterized as one of the platina group.

The platina or platinum group consists of six separate and distinct elementary metals, which are platinum, rhodium, iridium, osmium, selenium, and tellurium. They are all rare elements in nature. Manifestly they are found in combination, and each by suitable process, complicated, it is true, is segregable from the others. The last discovered of the group was rhodium.

Platinum is perhaps a more familiar term outside of the chemical or scientific circles, and platinum is chiefly used for electrical pur-

poses in the manufacture of platinum wire and to some extent in chemistry. Sulphuric-acid apparatus, for instance, is made of platinum. The entire group, it seems, has been used in a coarse compound, as platinum.

Rhodium, when separated from the group by appropriate process, is used chiefly for scientific purposes and is found in very minute quantities and is sometimes used as a compound with gold in the manufacture of liquid bright gold, constituting an infinitesimal part. The respective uses of the others of the platinum group are here immaterial.

That rhodium is a separate and distinct element is agreed by all the witnesses and is conclusively shown by its method of preparation. A succinct statement of this, without exploiting the unnecessary details of the metallurgical operations, is set forth in Watts's Dictionary of Chemistry, volume 4, article "Rhodium," as follows:

> Rhodium is generally prepared by adding iron to the mother liquors from which platinum has been extracted * * *, and then treating the solid so prepared. The processes for the treatment of this residue are many.

Its elimination and segregation concerns the residue after the platinum, which is a separate element, has been extracted. That it differs in material necessarily follows; otherwise this element would not be separable and distinguishable.

The melting point of the two properties is different. So that it may be properly said that it differs from platinum in material, quality, and use.

The relevant provisions of law of the act of 1897 touching this group of metals, as quoted above, witnesses that the metals of this group specifically provided for were platinum, palladium, and iridium. The fact that palladium and iridium, similarly associated in the platinum group, were specifically provided for in the free list by Congress bears ample proof of the view of that body in contemplation of them, and that Congress viewed them, in a dutiable sense, as separate and distinct metals. Further light is thrown upon this aspect of the case by the language of Congress in the tariff act of 1909. In the last act Congress has, in paragraph 595 of the free list, specifically named all of this group in this language:

> Iridium, osmium, palladium, rhodium, and ruthenium and native combinations thereof with one another or with platinum.

Counsel for the Government contends, with much force, that this is a legislative interpretation of the intent of Congress in the act of 1897. We are rather constrained to the view that it is a legislative admission that the language of the act of 1897 was not sufficient to cover the omitted metals found in this group and not named in the statute, and for that reason the respective sections of the free list,

above quoted, pertinent to this subject, were not, and were not deemed by Congress, sufficiently broad to include the omitted elements; hence its extended scope in the act of 1909.

The Board of General Appraisers found the merchandise to be a "pure metal." This finding is amply supported and uncontradicted by all the evidence in the record.

The board, however, concluded that by reason of the principles laid down in United States *v*. Roessler & Hasslacher Chemical Co. (137 Fed. Rep., 770) the classification under paragraph 183 of the tariff act of 1897 was precluded. The principle announced in that decision seems to have controlled the conclusions of the board, pertinent to paragraph 183, to hold that no metal could be included within that paragraph which was not capable of being wrought. The language of the court in that particular is as follows:

The ordinary meaning of "wrought" is worked up, elaborated, worked into shape, labored, manufactured, not rough or crude. "Unwrought" imparts the reverse of these conditions. When one speaks of an unwrought material he means one which has not been worked into shape, one which is unlabored, unelaborated, rough and crude. But the word also implies a material which is capable of being transformed from its crude material to an improved condition, produced by the labor to which it may be subjected. To be more specific, "unwrought metal" implies a metal which is capable of being wrought and not a substance which is only fit to be thrown into the crucible to be melted up with other ingredients to produce an entirely different and distinct product.

We are unable to agree with the Circuit Court of Appeals for the Second District in this construction of the paragraph. It seems to us that every well-settled canon of customs interpretation militates against the construction given the word "unwrought" as adopted by that court. That construction rests upon an assumed import or implication rather than the common understanding of the word.

It is a rule of statutory interpretation, confined not alone to the customs laws, but running through the universal scope of law, the "words and phrases are assumed to be used in their natural signification" and shall be so construed, the sole exception in customs adjudication being that commercial designation shall obtain over the common and accepted understanding of words where such is duly proven. In other words, before the plain understanding of a term can be deviated from it must be shown by plenary proof to have a different import in trade and commerce. The rule is perhaps most concisely stated in Sonn *v*. Magone (159 U. S., 417), wherein the Supreme Court declares in these words:

In construing a tariff act, when it is claimed the commercial use of a word or phrase in it differs from *the ordinary signification* of such word or phrase, in order that the former prevail over the latter it must appear that the commercial designation is the result of established usage in commerce and trade and that at the time of the passage of the act that usage was definite, uniform, and general, and not partial, local, or personal.

See also Maddock *v.* Magone (152 U. S., 368); United States *v.* Buffalo Natural Gas & Fuel Co. (172 U. S., 339).

The legitimate corollary of this often-pronounced rule of interpretation is that no meaning shall be given a word or phrase used in customs laws other than its ordinary or accepted meaning except upon plenary proof that this extraordinary meaning is fully and completely understood and accepted throughout the United States by all of those dealing wholesale in that class of goods.

The rule is based upon the sound principle that customs laws are drawn in view of the lay understanding (first) of the trade subject thereto, and (secondly) for the information of merchants and dealers who are not lawyers, and perchance may not be skilled in the finesse of the English language and who, with a common lay understanding, will be completely informed by the plain words of the statute as drawn by Congress what duties are levied and what penalties they may expect for a violation of the law.

Taxes are never levied by implication, and we do not feel at liberty, except in accordance with higher authority, to ingraft upon a statute a meaning resting solely in implication, rather than in the natural import of the expressed words as commonly accepted and understood by layman and merchant.

The rule is perhaps more clearly and concisely stated by Mr. Justice Story in Adams et al. *v.* Bancroft (1 Fed. Cas., 84), wherein he uses the following language:

I may add in this connection, that laws imposing duties are never construed *beyond the natural import of the language;* and duties are never imposed upon citizens upon doubtful interpretations; for every duty imposes a burden on the public at large; and is construed strictly, and *must be made out in a clear and determinate manner from the language of the statute.*

This decision has been quoted with approval by the Supreme Court of the United States and other courts in numerous cases. See Hartranft *v.* Weigmann (121 U. S., 609), and cases cited therein. No more concise statement of the law can be had.

In view of a rule so often pronounced we can not assume that poverty of language in the vocabulary of the Congress which employed it as will levy taxes and visit penalties upon the citizen or rest the collection of the revenues of the Government by implication.

These expressions are particularly pertinent with reference to the implied meaning added to the word "unwrought" in the paragraph under consideration. The ordinary definition of that word as approved by lexicographers is:

Worcester's Dictionary:

*Unwrought:* Not wrought; not labored; not manufactured.

Century Dictionary:

*Unwrought:* Not labored; not manufactured; not worked up.

And so in Soule's Dictionary of English Synonyms. Synonymous with "unwrought" are given the following:

Unfashioned, unformed, rude, crude, rough.

The natural meaning of unwrought, as shown by these definitions and synonyms is plainly and unmistakably nothing more or less than an expression of an unmanufactured condition, or a condition not in anywise advanced in manufacture. In fact, in other paragraphs of the tariff act, notably 93 and 595 of the free list, the word is used in exact apposition to "advanced in manufacture" or "manufactured," which may be deemed a legislative expression of its intended scope.

The learned court for the second district manifestly had these definitions in mind when it stated the natural import of the word "unwrought" as "when one speaks of an unwrought material he means one which has not been worked into shape; one which is unlabored, unelaborated, rough, and crude."

Then the learned court proceeds to fasten upon the word an implication defined by the court in the following language:

To be more specific, "unwrought metal" implies a metal which is capable of being wrought and not a substance which is only fit to be thrown into the crucible * * *.

Waiving for the moment the natural significance of the term "unwrought," we hesitate to confine its necessary implication as confined by the court. The one implication allowed by the language of the court, as appears from the whole opinion, is a quality akin to malleability, or, rather, it assumes as necessary such a concrete form of metal as by hammering or by other process applied directly thereto will shape or advance it into some other article or condition. We do not believe that the necessary coincident condition to that of being "unlabored," "rough," or "crude," or "not worked up," the synonyms of "unwrought," is solely that the article be in such concrete form as by application of the hammer or other direct process will advance it into a different article or condition. We think that the article may be clearly unwrought without being malleable or in condition susceptible of advancement in manufacture as imported. It may be unwrought though the necessary added processes change its imported form or condition or its atomic construction and constitute, rather, a converted or new manufacture of the article; for example, by melting or dissolving in acids.

The mind can readily conceive of a pure metal which is not worked into shape, or which is rough, or which is crude, or which is unlabored, and which, at the same time, coincident with any one of these qualities, is not malleable, nor as yet of that concrete form which will permit of a changed condition by direct application of labor or

process. In fact, the latest lexicographic authority (Oxford Dictionary) plainly points out that while malleability, conductivity, and other qualities were formerly considered necessary elements of a metal, in the growth and development of commerce, manufacture, and invention, such have long ceased to be necessary. It states:

Any member of the class of substances represented by gold, silver, copper, iron, lead, and tin. Originally this class was regarded as including only these bodies together with certain alloys (as brass and bronze), and hence as definable by their common properties, viz, high specific gravity and density, fusibility, malleability, opacity, and a peculiar luster (known specifically as "metallic"). In process of time other substances were discovered to have most but not all of these properties; the class was thus gradually extended, the properties viewed as essential to its definition becoming fewer. From the point of view of modern chemistry the "metals" are a division (including by far the greater number) of the "elements" or simple substances. Among them are all the original (simple) "metals"; of the latter additions to the list some possess all the properties formerly viewed as characteristic of a metal, *while others possess hardly any of them;* the "metallic luster" is perhaps the most constant. By some chemists the radical ammonium ($NH^4$) and derivatives thereof have been designated as "metals" on account of the analogy of their compounds with those of the metals potassium and sodium.

In popular language the term is not applied to a metallic element when in such a state of combination that its identity is disguised.

So that "unwrought" necessarily implies other conditions than capability of being wrought, many of which absolutely negative malleability or a capacity of being advanced from the per se condition. It is not for this court to attribute some and deny other of the attendant implications to a word as used in the statute.

Some light upon the intent of Congress and the sense in which the word was used in this paragraph may be shed by an examination of the same word in other paragraphs of the act.

For example, in paragraph 93 provision is made for "clays or earths unwrought or unmanufactured," and the same "wrought or manufactured," and in the same paragraph for fuller's earth "unwrought or unmanufactured," and the same material "wrought or manufactured." These clays or earths unwrought or unmanufactured, by a long line of decisions of customs officials, are the clays in their natural condition and not advanced by grinding or other process. In this condition clay or earth is quite similar to the original element rhodium, which seems to have been in the form resembling a black powder in this case.

There is nothing of malleability in the clay or earth, nor can it be labored into another form without the addition of other elements. Each process is a separation and rearrangement of its constituent atoms, rather than an advancement from its imported condition.

An equally familiar principle of interpretation which leads to the same conclusion in this case is that recently emphasized by the Supreme Court of the United States in the case of United States *v.*

Riggs (203 U. S., 137). In that case the Supreme Court adopted that construction of certain paragraphs which would affect the apparent intent of Congress, as the court said was expressed everywhere in the act, that the more valuable goods should bear the heavier duty.

Bearing in mind this principle, and examining in its light paragraph 183 under consideration, the intent of Congress in the use of the word "unwrought" becomes apparent. Two substances are provided for—"metallic mineral substances in a crude state" and "metals unwrought * * * ." The same rate of duty is levied upon each—20 per cent ad valorem. Metallic mineral substances consist of a metal combined with some foreign or other substance. Metals unwrought consist of a pure metal, such as the Board of General Appraisers found this article.

In most cases, and clearly from the record in this case, a pure metal is in an advanced state or condition to that occupied by a metallic mineral substance in that it is separated from the substances which originally surrounded it. It may not be labored or in anywise advanced in condition, or wrought, if you please, but its segregation from the cradle of its creation and bringing to its imported condition no doubt has called for the expenditure of labor and the application of process. A metallic mineral substance may not have called for either, and is, therefore, more nearly in the mother condition. Metal unwrought, therefore, is usually in an advanced condition from a metallic mineral substance. If consistency is to be observed in the general scheme of Congress in levying duties, 20 per cent ad valorem, measured by the processes applied upon metals unwrought, will be a lower rate than the same rate upon metallic mineral substances. To reduce that rate, as claimed by the appellees, to 10 per cent ad valorem, would do violence to the intent of Congress as expressed in the language under consideration. Certainly such an interpretation should not be adopted in the presence of the rule stated when the sole reason that can be assigned for the same was founded upon implication from a term used and an assumption beyond its plain, ordinary meaning.

We think from its association in the paragraph Congress used the word in its ordinary acceptation and in contradistinction from metals manufactured or in anywise advanced in value, without any qualification by implication, the whole paragraph being devoted to crude raw metals, metallic mineral substances, and a class of sands exactly as the same term is used in paragraph 93 of the same act.

The return of the chemist at the port of New York and the testimony of the Government witnesses establish, without doubt, the fact that the merchandise was not in its crude state, but was a crude metal reduced from its crude state and separated from the accom-

panying substances surrounding it in that state by elaborate processes. It is not, therefore, a metallic mineral substance in a crude state within purview of paragraph 183. The Board of General Appraisers, however, found the importation to be a pure metal, and we think this finding incontrovertible. It follows that it is properly dutiable as such at the rate assessed by the collector, and accordingly the decision of the Board of General Appraisers is *reversed*.