SCHADE & CO. *v.* UNITED STATES (No. 1404).[1]

1. WHEAT.

"Wheat" is used in the tariff act of 1909 without limitation or qualification, and in the absence of a contrary commercial custom must be applied to every kind and class of merchandise embraced in the term.

2. WHEAT, "NO GRADE."

This importation was of frozen Manitoba wheat. Even if it be assumed that no commercial designation was shown, and that the merchandise here was improperly classed as "no grade," the record and the samples clearly establish that the common, ordinary designation of "wheat" applies, and this is so, though the wheat was confessedly of inferior quality, suitable alone for animal food.

United States Court of Customs Appeals, December 14, 1914.

APPEAL from Board of United States General Appraisers, G. A. 7552 (T. D. 34353).

[Affirmed.]

*Ralph Pierson* for appellants.

*Bert Hanson*, Assistant Attorney General (*Charles E. McNabb*, assistant attorney, of counsel; *Charles D. Lawrence*, special attorney, on the brief), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

This appeal relates to the proper dutiable classification of a quantity of merchandise originating from Manitoba, Canada, and entered at the port of Chicago. It was there classified and assessed for duty as "wheat" under the provisions of paragraph 242 of the tariff act of August 5, 1909, which reads:

242. Wheat, twenty-five cents per bushel.

The importer protested, claiming the merchandise properly dutiable as an unenumerated unmanufactured article under the provisions of

---

[1] Reported in T. D. 35002 (27 Treas. Dec., 663).

paragraph 480 of the act. On appeal to the Board of General Appraisers the decision of the collector of customs at the port of Chicago was affirmed, and this appeal, therefore, brought here by the importers, involves solely the determination of the question whether or not the imported merchandise is "wheat" within that term as used in paragraph 242 of the said act.

Great diligence has been displayed by appellants' counsel in the collection of certificates and testimony of persons, official and otherwise, as to what constitutes wheat. This evidence is directed rather to the establishment of the different grades of wheat and their uses than to proof of a trade term within which the merchandise is included, or from which it is excluded by the general and uniform understanding of the trade and commerce of the United States. It is a matter of trade classification rather than of designation. In view of the industry displayed by importers' counsel in the collection of this evidence and his urgent insistence that his protest is well made and that the board erred we will with a degree of detail recite what we regard the more important parts of the material evidentiary facts in the case. We repeat, for the purpose of emphasis and that it may be constantly borne in mind in the consideration of the testimony offered, that the sole question in the case is whether or not the imported merchandise is wheat? The term is used in the tariff law without limitation, and, therefore, the court is bound to hold included therewithin for dutiable classification in the absence of an established trade usage every kind and description of wheat. It is a general term, and the rule long established in tariff interpretation is that where a general term is used in the law without qualification it must, in the absence of a contrary commercial custom, be applied in its broadest significance, including every kind and class of merchandise properly referable thereto, either directly or as a species the genus of which is embraced within the particular tariff nomenclature. United States v. Wells, Fargo & Co. (1 Ct. Cust. Appls., 158; T. D. 31211); United States v. Salomon (1 Ct. Cust. Appls., 246; T. D. 31277); Schoellkopf, Hartford & MacLagan (Ltd.) v. United States (71 Fed., 694).

Historically it seems that during the year in which this merchandise was grown the wheat crop in the Province of Manitoba, Canada, was extraordinarily large and the year excessively wet, so that great difficulty was experienced by the farmers in saving the crop. It is recited in the testimony that much of it was left in the shock all winter and some thrashed on the ground. Additional difficulty was encountered in that the railroads were unable to handle the crop on account of its abundance and the scarcity of labor, so that much of it when shipped was in transit for two or three months, and consequently a large percentage spoiled in transit. The wheat crop, therefore, of that Province and others similarly situated during

that year was largely of the same class. This importation was a part of that crop. It originated in Manitoba Province, Canada, and was billed from Fort William, Ontario, destined for South Chicago via steamer *A. G. Brower*.

By the consular invoice, which arrived in Chicago after entry by pro forma invoice, the merchandise is described as 84,045 bushels of "no grade feed wheat, tough." Upon arrival at the port of Chicago it was entered under oath without certified invoice by W. C. Frost as attorney in fact. The application describes the merchandise as "feed wheat, tough, no grade," and was made on May 15, 1912. The entry for immediate consumption, made on the same day, by the same attorney in fact, is so mutilated by interlineations that without explanation the names designated can not be assumed.

At the time of exportation, when the merchandise was, before being loaded, at Fort William, Canada, it was inspected and classified by the official inspector of grain for the division of Manitoba, Canada. It is described in his certificates as "Manitoba wheat, no grade, tough," "feed," and further classified as "*commercial grade.*" Upon arrival at the port of destination and being duly submitted to the appraiser at the port of Chicago by the collector for appraisement, the latter official submitted samples to the Illinois State grain inspection department. These certificates introduced into the record designate it as "sample grade spring wheat." It was also by sample submitted by the appraiser to two seed houses in Chicago, one of which certified that it showed a test of 36 per cent germination and the other 34 per cent. A sample submitted to the Department of Agriculture at Washington returned germination 51.5 per cent. The appraiser's return, which is before us, recites that the Illinois State grain inspection department returned and graded the article as "sample grade wheat, weighing 47 pounds to the bushel, moisture test, 18.10."

At the hearings before the Board of General Appraisers several witnesses testified. The efforts of counsel for the importers seem to have been to establish that the imported merchandise was not fit for the purposes of making flour or for seed, and that it was not one of the recognized grades of wheat such as is classed in the wheat trade of the United States.

While it may be true that the importation was not commercially suitable for the making of flour or for seed, we think that those facts do not exclude it from classification as wheat as that term is used in the tariff act. Such testimony only establishes its classification in two of the several well-known uses of wheat. This assumption, however, does not presuppose that such unfitness was entirely established by this record. The samples of the merchandise submitted to the Department of Agriculture at Washington, D. C., for tests in this particular were returned as producing an expansion of flour of

about 60 per cent of the standard and a loaf of bread of about two-thirds of the standard, which was very coarse grained and of a very dark grayish-brown color. The crumb was somewhat sticky, the odor and flavor not unpleasant. It could be fairly said to be only of exceptional use as flour.

Upon the contention that this importation was not within the recognized trade grades of wheat several witnesses testified that different grades of wheat were recognized in the grain markets of different States of the Middle West. No one of them save Mr. R. J. Henderson was called upon to give an enumeration of these grades. This witness seems to have been well qualified in so far as his testimony went. He had been engaged in handling wheat about 28 years, the greater portion of that time in the part stated of the United States and a part of the time in Canada. He gave the grades as No. 1, hard; No. 1 Northern, No. 2 Northern, No. 3 Northern, No. 4 Northern, rejected and no grade—seven grades. He confined these grades to spring wheat. He stated that No. 4 grade was put in in recent years, but all the others were of long standing, and that the grades were created by the "Board of Warehouse Commissioners," a State board of the State of Minnesota generally recognized by the buyers and sellers as were similar grades in other States differing possibly in name only and not in application.

The controverted point in the case was whether or not "no grade," which seems of uniform use at least in the Middle West of this country and in Canada, expressed a grade of wheat or a limit beyond which the article ceased to be wheat commercially. Upon this Mr. Henderson, who was the importers' witness, testified:

Q. My point is this: Is the wheat designated as "no grade" wheat recognized in the trade as one of the grades of wheat?—A. Yes, sir.

He further delineated a difference in that the grades to and including No. 4 were ofttimes bought and sold in the markets by grade alone without sample, but that after or below that point wheat graded as "rejected" and "no grade" was bought only on sample. With such there must always be a sample. Nevertheless the testimony of this witness, which is the clearest upon the subject in this record and which is not contradicted but rather confirmed by the testimony of the other witnesses, seems to establish that "no grade" is a grade of wheat, though of inferior quality, which can be sold upon sample only and not according to grade without sample, as is the case with all the other grades except "rejected."

Mr. John Johnson was also called upon the part of appellants. Mr. Johnson is grain inspector for the Illinois Grain Inspection Department and had inspected the particular importation and made the reports in question. He testified:

Q. (By Mr. PIERSON.) Please state what this consisted of.—A. Badly frosted wheat, and under our ruling grain of that kind should be made nothing but sample grade.

Q. By the term "sample grade" you could include any wheat, no matter how badly damaged, which is above that, that takes the grade of "no grade wheat"?—A. Wheat that can not be graded; anything is graded "sample" wheat by our department.

    \*      \*      \*      \*      \*      \*      \*

Q. When you said that this wheat was badly damaged did you mean anything more than frosted?—A. That is all that is necessary. We have to state whether that car had such and such a thing. Our ruling "badly damaged" would come in "sample grade."

Having testified as to his initials upon certain certificates the following was elicited:

Q. What do the initials "SG" indicate?—A. Sample grade.

Q. And that means what?—A. Sample grade wheat is wheat that can not be graded.

Reading this testimony in the light of its inherent probabilities and in conjunction with the testimony of Mr. R. J. Henderson some light is thrown upon the actual situation. Sample grade and no grade wheat is wheat that can not be further graded than to be classed under the general designation "no grade" or "sample grade." It is called "sample" grade undoubtedly because a grade that by reason of the great varieties included has to be sold by sample only and not by grade. It is, nevertheless, a grade of wheat of this broad inclusiveness, and so recognized in the wheat trade in the localities stated.

This seems to accord also with the Canadian practice, for be it remembered that the inspector of grain for the division of Manitoba, whence this importation originated, classed it as "Manitoba wheat, no grade, tough," and further added "feed" and "*commercial grade*" in his certificates.

So that assuming that the testimony in this record, which was confined to the trade classifications of three Middle Western States and Canada, established prima facie a general uniform classification throughout the United States, we think this importation nevertheless falls within one of those grades known as the "no grade" or "sample grade" of wheat, a grade of such great range that it is bought and sold in the wheat markets by sample only for certainty but nevertheless as wheat.

In the other view, and assuming that no commercial designation or classification was established, it seems too obvious for discussion after reading this record and examining the sample in the case that this merchandise falls within the common ordinary designation of "wheat," though of an inferior quality and probably suitable for stock or chicken feeding purposes only.

After a careful review of all the testimony in this case, commencing with the designation of this merchandise as "wheat" in the consular invoice, followed by that in the oath to enter without certified invoice, and in all of the official certificates made by the officials examining the same, and by every witness who testified in the case, and finally being included as a grade of wheat known as "no grade" and "sample grade," we are satisfied that, though inferior, it is within the

tariff designation "wheat," whether as classed by any wheat trade or the general scope of that word. It may not be suitable for flour, and it may not be suitable for seed, but it undoubtedly falls within that large class of imported grains known as "feed." The market quotations of grain coming under the observation of all familiar therewith in this country are in many instances divided into two classes, (1) milling and shipping and (2) feed. The former by no means includes all of the wheat of commerce. There is no limitation or exposition in the testimony upon the character of feed wheat. None of the witnesses called dealt in that line of wheat, though one, Mr. Charles F. Sparks, for the importers, having examined a sample of this merchandise, stated:

> I am more or less familiar with *feed wheats* offered in the markets. (Record, p. 18.)

The witnesses adduced were not such as dealt in feed wheat, and none was introduced nor was any testimony offered to show this merchandise not included within that designation by dealers in feed grains. It is a matter of common understanding, however, that much wheat is used for feeding stock and other than human animals, and the above is prima facie proof in this record of markets for such, were such proof needed in addition to the common knowledge of all. It is conceded in this record by the importers and the purchasers of this grain that it was actually used for making chicken feed and that it was suitable for that purpose.

We are, therefore, of the opinion that the decision of the Board of General Appraisers should be, and is, *affirmed*.