BUSH & CO. (INC.) *v.* UNITED STATES (No. 2271).[1]

1. CLEANED RICE, DAMAGED.

Cleaned rice which has been damaged is still cleaned rice under paragraph 193, tariff act of 1913, and has not become a crude vegetable substance under paragraph 552. See Tower & Sons v. United States (11 Ct. Cust. Appls. 489; T. D. 39629).

2. NONIMPORTATION—EVIDENCE, BURDEN OF PROOF.

An importer claiming nonimportation of a portion of a shipment by reason of damage amounting to destruction must show the amount destroyed and that the destruction occurred before importation.

United States Court of Customs Appeals, November 17, 1923.

APPEAL from Board of United States General Appraisers, G. A. 8624 (T. D. 39530).

[Affirmed.]

*Barnes, Chilvers & Halstead* (*Frank M. Halstead* of counsel) for appellant.

*William W. Hoppin*, Assistant Attorney General (*Charles D. Lawrence* and *Ralph Folks*, special attorneys, of counsel), for the United States.

[1] T. D. 39894.

[Oral argument October 3, 1923, by Mr. Halstead and Mr. Lawrence.]

Before MARTIN, Presiding Judge, and SMITH, BARBER, and BLAND, Associate Judges.

BARBER, Judge, delivered the opinion of the court:

Ten thousand bags of rice of the net weight of substantially 97 pounds per bag were shipped by one Da Rocha from Hongkong, China, on or about April 8, 1919, by the steamer *Manila Maru*, consigned to Suzuki & Co., of San Francisco, who are referred to in the record as the importers.

The rice was stowed in what is referred to as " 'tween decks." While the steamer was at sea on May 4 following, smoke was discovered coming out of No. 5 hold, where some matting was stored and below where some of the rice was placed. Water was immediately pumped into the hold and steam turned into it for several hours, when the fire appeared to have been extinguished. Steam, however, was kept turned on " 'tween decks" until May 11, but no further signs of fire appeared during that time. May 12 the vessel arrived at the port of Seattle, at which port 5,000 bags were unladen. Concerning these bags, no question is made and nothing appears as to their condition. May 13 the vessel arrived at Tacoma. The hatches were removed and the discharge of the cargo begun. About 5 o'clock of that day fire again broke out in hold No. 5. Water was again turned on and the unlading continued until all the rice was removed from the steamer. Some 2,900 bags were placed upon two scows alongside the ship and the balance, 2,100 bags, on the dock. Of these, 900 bags were put under cover and 1,200 left exposed.

The result of the efforts to put out or keep the fire under subjection was, that some of the rice was badly water-soaked; the major part of it was water-soaked or heated and moistened by the steam. A minor part was in fairly good condition. Witnesses substantially agreed that the 2,900 bags were in the worst condition, that the 1,200 bags were not quite so bad, and the 900 were still better. In a good many of the latter the rice was but little damaged. The rice was insured. At the instance of the insurance company, the importer and perhaps the owner of the vessel, an examination or survey of the rice was made by an adjuster of marine losses and a marine surveyor, for the purpose of ascertaining the damage to the rice, which apparently was unladen under their supervision. The result was that the insurance company paid the total loss under the policies. The marine surveyor sold the rice to one Colsky, whose business was the buying of salvaged merchandise, and turned over to the insurance company the amount Colsky paid him for it.

While the unlading was in progress, or soon after, the pure food officials of the Department of Agriculture at Seattle requested the collector at Tacoma to refuse delivery of the rice as damaged and

not fit to be used for human consumption in its imported condition, but after learning that some of it was fit for such use, allowed delivery to be made to Colsky on condition that they be permitted to see the rice after it had been reconditioned, and that the damaged portion be either destroyed or sold for animal food.

Colsky bought the entire 5,000 bags for 30 cents per bag, making a total of $1,500, thinking at the time that he could abandon a part of it and pay duty upon the rest, but the customs officials declined to allow him to do this, so he took the entire quantity and paid the assessed duty of 1 cent per pound thereon, amounting to $4,592.50.

May 20 the merchandise was apparently entered for consumption by George S. Bush & Co. (Inc.), appellant here. Just how it came to be entered by them or their interest therein does not appear.

Colsky immediately sold 2,483 sacks of the merchandise in the condition it was unladen and without being reconditioned for $25 per ton. The purchaser placed it in a warehouse, where it dried out in time, and used it for hog feed covering a period of six or seven months. Colsky took the remainder to Seattle, where it was reconditioned by putting it through a sifting machine. As a result of the reconditioning process he got 753 bags of 100 pounds each which were sold for hog feed at $30 a ton, and 1,663 bags of 100 pounds each which were sold at 6½ cents a pound for human consumption. The aggregate amount he received for the rice was $14,930.13. Including the purchase price, $1,500, and the duty paid by him, $4,592.50, the cost of reconditioning, transportation and storage, and other incidental charges, his total outlay on account of the rice was $11,247.55, and he testified that his profit on the transaction was about $2,800.

The record shows that one reason why he succeeded so well was that at the time he sold the rice for human consumption there was a scarcity of that commodity. The quantity he sold in pounds was some less than the quantity theoretically contained in the 5,000 bags. Just how this happened is not explained; Colsky saying that perhaps some of it stuck to the sacks. The pure food officials suggested that the shrinkage was partly due to slack sacks.

The merchandise was classified under paragraph 193 of the tariff act of 1913 as rice, cleaned, and duty taken thereon at the rate of 1 cent per pound.

The appellant here filed its protest, which was duly heard and overruled by the Board of General Appraisers.

In this court appellant contends first, that all the rice should be classified as a crude vegetable substance and held free of duty under paragraph 552 of the act which allows free entry to crude vegetable substances not specially provided for. Second, if this claim be denied, that duty as assessed be upheld only as to 166,300 pounds of rice contained in the 1,663 bags which were sold for human con-

sumption, and that as to the balance of the importation it be regarded as entitled to free entry under said paragraph 552, or as a nonimportation under the rule of Lawder *v.* Stone (187 U. S. 281); United States *v.* Habicht (1 Ct. Cust. Appls. 53; T. D. 31031); United States *v.* Shallus (2 Ct. Cust. Appls. 332; T. D. 32074); United States *v.* Pastene Co. (3 Ct. Cust. Appls. 164; T. D. 32458); and Poole Co. *v.* United States (9 Ct. Cust. Appls. 271; T. D. 38216).

There was some question as to commercial designation at the hearing before the board, but it is not raised here.

Paragraph 193 provides for "rice, cleaned," and there is no controversy that at the time of its shipment it was that commodity. It is true that when it was unladen, it was more or less wet, heated, smelled of smoke, and had begun, as the odors emanating therefrom indicated, to decompose. These unfavorable qualities, however, as was evidenced by the behavior of the 2,483 bags sold in the condition in which they were unladen, began to improve as soon as the bags were stored in warehouse, and it turned out that the rice therein, without anything being done to it, was suitable and was used for animal food, and was apparently worth what was paid for it, $25 a ton. And it may be observed that the rice in these bags was in as bad condition as any of the importation. Paragraph 193 contains no provision for a diminution of the duty rate thereunder because of damage. Cleaned rice, regardless of its quality, is dutiable at the specific rate therein provided. See Tower & Sons *v.* United States (11 Ct. Cust. Appls. 489; T. D. 39629).

We do not think the facts in this case bring it within the rule of the cases above cited and relied upon by the appellant. An examination thereof discloses that in every case a definitely ascertained percentage or portion of each importation had become absolutely worthless *before* importation, and in some of the cases it was condemned by health officers and destroyed. It may be that if it had appeared in this case that some definite part of the rice at the time it crossed the customs line had become absolutely valueless, the appellant would be entitled to relief as to that part. The burden, however, was upon appellant to establish that fact, and counsel rely in this regard upon the evidence to the effect that 2,900 bags of the rice which were put upon scows were not worth the duty assessed thereon and the necessary transportation charges and expenses of sale; that it did, however, have a commercial value is demonstrated by the fact that 2,483 bags thereof were in their imported condition immediately sold for $25 per ton and used for animal food, while the balance of the 2,900 bags was reconditioned and thereafter sold. If any part of the importation was destroyed or absolutely worthless, the burden was upon the appellant to establish the quantity, percentage, or amount thereof, and in this failed.

We think it is quite plain that under the facts of this case the contention that all or any part of the merchandise reverted to the condition of a crude vegetable substance and so became entitled to free entry under paragraph 552 is untenable because, when imported, it was still cleaned rice, although damaged.   It had been advanced from its crude condition to rice, cleaned, before exportation, and subjecting it to water and steam while in transit did not restore it to its condition of a crude vegetable substance, but damaged it.

We think the judgment of the Board of General Appraisers ought to be, and it is, *affirmed.*