(C. D. 472)

S. L. JONES & CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 21, 1941)

*Harper & Harper* (*Lawrence A. Harper* and *Walter I. Carpeneti* of counsel) for the plaintiffs.

*Charles D. Lawrence*, Acting Assistant Attorney General (*Richard F. Weeks, James F. Donnelly*, and *Joseph E. Weil*, special attorneys), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges; KEEFE, J., not participating.

EVANS, Judge: This is an action against the United States wherein the plaintiffs seek to recover certain sums of money claimed to have been unlawfully exacted by the collector of customs at the port of Los Angeles on an importation of merchandise entered as white hulled sesame seeds. The merchandise was admitted free of so-called regular duty under the Tariff Act of 1930 because this type of merchandise is not taxed under said act. But the Internal Revenue Act of 1938, which was an amendment to the Internal Revenue Act of 1932, provides in section 702 for a duty of 1.18 cents per pound upon sesame seeds. That amount of duty was collected upon the instant importation and the importers claim that it was not dutiable under the said revenue act. We will not quote the free provisions of the Tariff Act of 1930 because no question was raised which involved that point.

T. D. 49643 sets out regulations concerning taxes on imported oils and other products as provided for in the revenue act mentioned, and said regulations also quote the statute in question, from which it

appears that section 702 contemplates amendment to section 601 (C) (8) of the Revenue Act of 1932. Paragraph (8) (A) of section 702 provides generally for taxes on whale oil, fish oil, and other marine-animal and animal oils. Section (B) provides generally for a tax on oils from various seeds and fatty acids derived therefrom. Section (C) provides for articles, merchandise, and combinations derived from one or more of the products enumerated in (A) and (B) *supra*. Section (D) of said act reads as follows:

(D) Hempseed, 1.24 cents per pound, perilla seed, 1.38 cents per pound; kapok seed, 2 cents per pound; rapeseed, 2 cents per pound; and sesame seed, 1.18 cents per pound.

It appears that this merchandise was entered at the port of Los Angeles on May 19, 1938. On the date of entry the internal revenue act involved had not yet become effective. This act was not signed by the President but became a law under provisions of the Constitution on May 28, 1938. However, the entry involved was a warehouse entry and the merchandise apparently remained in warehouse until after May 28, 1938, as evidenced by the fact that duty was collected at $1.18 per pound, the rate provided in the Revenue Act of 1938. The importers assert that this merchandise was not subject to the excise tax as levied, since the commodity is not a seed, being only part of a seed; and second, because Congress did not intend to include this merchandise under the provisions of the act in question.

The testimony has been rather completely and fairly summated in the importers' brief and we quote it verbatim:

Plaintiff called as its first witness Percy C. Denroche, president of the plaintiff company since 1908. His company has been purchasing sesame seeds over many years, both the hulled and unhulled sesame seeds. He has made a study of sesame seeds over a long period of time (R. 7). He has seen sesame seed hulled many times in China by a method which is not used today (R. 4). Although the processes produce the same result (R. 8), the method he observed in China consisted of putting the seeds in water and soaking them until the outer covering became rather soft or flexible. Then they were put in a cotton duck bag about seven feet long, which was operated by two men who would shove the seed back and forth (R. 8, 9). He identified Illustrative Exhibit 1 as being similar in all material respects to the merchandise covered by the protest (R. 5, 8).

His company formerly used to sell this merchandise to large bakers and to confectionery houses; lately it has been selling to supply houses who take care of the small trade. (R. 9.)

His firm had also imported sesame seed which had not been hulled, but this was prior to the Bailey Amendment, effective in 1936, which placed the excise tax on sesame seed. Prior to that time they were large importers of unhulled sesame seed (R. 11).

He stated that Plaintiff's Illustrative Exhibit 2 represented Chinese white sesame seed which has not been hulled. This has been sold to the oil mills, where he has seen it crushed and pressed. It produces a very fine edible oil and a very fine oil cake meal (R. 13). They had imported tremendous quantities of

this seed since 1922. It was sold only to the oil mills, whereas the *hulled* sesame seed had never been sold to oil mills, nor had he ever heard of hulled seeds being sold to oil mills (R. 15).

His company had sold the unhulled seed at San Francisco, Oakland, Los Angeles, and as far back as Baltimore. It had business relations with practically every oil mill on the Pacific Coast (R. 17). The hulled seed cannot be used for the extraction or expression of oil because of its high cost (R. 16, 17).

The hulled seed is always ordered as "hulled sesame seed." (R. 23.) Part of Illustrative Exhibit 1 was given to Curtis & Tompkins, commercial chemists for germination tests.

Plaintiff's second witness was Herbert Hecht, a member for 20 years of the firm of D. Hecht & Company, general importers and exporters who import sesame seed (R. 25, 26). They import merchandise similar to Illustrative Exhibit 1 which he identified as Chinese white hulled sesame seed, as they import and sell large quantities of it. They have sold it principally to bakers' supply houses and jobbers on the Pacific Coast and in Philadelphia, New York, Baltimore and Chicago (R. 26). He identified Illustrative Exhibit 2 as unhulled sesame seed. His firm had had one or two transactions in that kind of seed. They sold it to the Globe Mills of Los Angeles (R. 27). They have never sold merchandise similar to Illustrative Exhibit 2 to bakery supply jobbers. He has never heard of it being sold in the trade to bakery jobbers (R. 28).

Plaintiff's third witness was Edmund S. McElligott, chemist for 30 years with Curtis & Tompkins (R. 31, 32). He tested the decorticated seed sent Curtis & Tompkins by plaintiff company, for germination. This he did by allowing the seed to germinate as long as they would germinate and the maximum germination which was achieved was 27% (R. 32). That for about 20 years, it is part of his regular occupation to make germination tests. In the course of a season he makes about 25 or 30 germination tests. (R. 33, 34.) That the percentage of Illustrative Exhibit 1 which sprouted were not healthy. In order to constitute good delivery there should be a germination of 85% or 90%, that is, 85% to 90% on sesame seeds. That the seeds which he tested were decorticated (R. 34). That in all the shipments that he has tested, he has never recalled testing any below 75% (R. 37).

As we view the issue raised herein, the only question that was not presented in the earlier case on this issue (*Sokol & Co.* v. *United States,* C. D. 313) is the question as to whether or not this merchandise is a seed within the purview of a taxing act. On that point we observe that section (D) provides for sesame seed without limitation or qualification. In other words, it is an *eo nomine* provision for sesame seed. It is true, as was said in the *Sokol* case, *supra,* the taxing provision is included in a statute which has provided for excise duties on oils and oil-producing commodities. Nevertheless, there is nothing in the law in question which restricts sesame seeds that are to be taxed under said act, to those used only for the production of oils, and it has often been held that where a general term is used in the law without qualification it must, in the absence of a contrary commercial custom, be applied in its broadest significance, including every kind and class of merchandise properly referable thereto, either directly or as a species, the genus of which is embraced within the particular tariff nomenclature. *United States* v. *Wells, Fargo & Co.* (1 Ct. Cust.

Appls. 158, T. D. 31211); *United States* v. *Salomón* (1 Ct. Cust. Appls. 246, T. D. 31277); *Schoellkopf, Hartford & MacLagan (Ltd.)* v. *United States* (71 Fed. 694).

There is some testimony that this sesame seed could not be used for the production of oil because it would be too expensive. Circumstances might alter that situation. We assume there is as much oil in a hulled seed as in an unhulled one. But regardless of that fact the merchandise is sesame seed and it is immaterial whether the seed is hulled or whether bakers and confectioners use it instead of oil refiners, or as to whether or not it will germinate to the degree required of certain seed when imported for forage crops.

Under the doctrine of the case of *Schade & Co.* v. *United States*, 5 Ct. Cust. Appls. 465, T. D. 35002, this merchandise is taxable as sesame seed. On the other point, that Congress only intended to tax sesame seed used for producing oil, we cannot add anything to the principle stated in the case of *Sokol & Co.* v. *United States*, C. D. 313, wherein it was held that sesame seed was properly subject to duty under a similar provision of the Internal Revenue Act of 1936.

The protest is overruled. It is so ordered.