(C.D. 2389)

A. L. FARNSWORTH *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 27, 1963)

*Stein & Shostak* (*Marjorie M. Shostak* and *S. Richard Shostak* of counsel) for the plaintiff.

*Joseph D. Guilfoyle*, Acting Assistant Attorney General (*Morris Braverman* and *Bernard J. Babb*, trial attorneys), for the defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges

JOHNSON, Judge: The merchandise involved in these cases, consolidated at the trial, consists of wood charcoal briquettes, imported from Mexico between September 9, 1957, and January 13, 1958, inclusive. It was assessed with duty at 15 per centum ad valorem under paragraph 216 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, as articles composed wholly or in part of carbon, not specially provided for. It is claimed that the merchandise is entitled to free entry under paragraph 1802 as wood charcoal.

When this case was called for trial, it was stipulated that the merchandise covered by entry number 170 of September 9, 1957, included

in protest number 58/17930, was similar in all material respects to the merchandise the subject of *Britton & Company* v. *United States*, 41 Cust. Ct. 64, C.D. 2021, which merchandise was held free of duty under paragraph 1802 of the Tariff Act of 1930 as wood charcoal.

Alonzo L. Farnsworth, general manager of a charcoal plant located in Nogales, Sonora, Mexico, described the production of the wood charcoal involved herein as follows: Wood is piled in mounds, covered with dirt and straw in two layers, lit, and allowed to smolder for 15 to 30 days. Then, oxygen is cut off so that the fire will go out. The wood is allowed to cool for a week; then, the mounds are torn down and the wood repiled and covered with dirt again to make sure there is no fire left. Then, it is cleaned out with pitchforks, loaded on trucks, and shipped by railroad to the witness' plant in Nogales.

The witness stated that, in producing merchandise such as that covered by entry number 170, the charcoal is first weighed and separated into 200-pound lots. Each lot is combined with 14 pounds of starch (7 per centum), placed in a mixer, and run through a hammer mill, which grinds the ingredients into a fine mesh. From there, it goes into a bin, where it is mixed with 20 per centum water. The mixture is put into a press which rolls the material into small briquettes about 2 inches square and about an inch in diameter. The briquettes are dropped onto a belt and taken to an oven for drying for 2 to 3 hours. When they are completely dried, they are put into 5-, 10-, and 20-pound bags and shipped across the border for sale.

According to the witness, the merchandise covered by the other entries involved herein was produced by a slightly different process, in that 6 pounds of starch (3 per centum) and 12 pounds of clay (6 per centum) were combined with 200 pounds of charcoal. In other respects, the process was the same. Clay was used in order to reduce the cost, as starch was quite expensive and there was a pile of clay available on the premises.

Mr. Farnsworth testified that the purpose of using starch is to bind the charcoal together and that clay has the same effect once it gets dry, but not while it is still wet. Therefore, some starch had to be used; otherwise, the briquettes would fall apart when they dropped out of the press. In other respects, the use of clay is detrimental as it causes a smothering effect on the charcoal, making the briquettes very hard to light. For this reason, sales fell off and customers started bringing the merchandise back. As a result, the manufacturer used clay only during the period involved herein and for about 2 weeks in 1961, when two loads of briquettes were returned from San Diego as unsatisfactory and had to be remanufactured.

The witness testified that charcoal briquettes are used for the same purpose as plain charcoal—to charcoal broil steaks. He knew of no other use. He said that briquettes were preferred to natural.

charcoal, because they were easier to light and because the uniform size made it less difficult to get a uniform fire for broiling. This form also eliminated the necessity of breaking up larger pieces of natural charcoal and getting the hands dirty.

Mr. Farnsworth said he had never heard of a retarder being used in the manufacture of charcoal briquettes. He said that a briquette made without clay would burn for 8 hours and that it was not desirable to cause it to burn longer, as a person does not usually charcoal broil for over 30 minutes.

The merchandise involved in *Britton & Company* v. *United States*, *supra*, consisted of briquettes, made from ground wood charcoal, with 9 per centum starch used as a binder. The briquettes were formed in a pelletiser and cut into pieces about 2½ inches long, 1¾ inches wide, and 1¼ inches high. In holding that this merchandise was classifiable as wood charcoal, the court stated (pp. 66–67):

> * * * It is well settled that an *eo nomine* statutory designation of an article, without limitation or a shown contrary legislative intent, judicial decision, or administrative practice, and without proof of commercial designation, includes all forms of the article, *Nootka Packing Co. et al.* v. *United States*, 22 C.C.P.A. (Customs) 464, T.D. 47464. Whether an article which, at one stage of its production is appropriately classified under a particular designation, has been so altered by subsequent operations that that designation is no longer proper, is a question of fact, depending upon the circumstances of the case. *John J. Coates Co. et al.* v. *United States*, 44 C.C.P.A. (Customs) 97, C.A.D. 643.
>
> *       *       *       *       *       *       *
>
> In the instant case, the only purpose of the starch was to act as a binder to hold the ground charcoal together. Except for that, its use was detrimental, since it produced an odor. According to the testimony herein, the briquettes are used for the same purpose as the charcoal in its original form—to furnish heat for cooking. Although this particular type of charcoal, in its original form and in briquette form, has only one use, it may still be classified as charcoal. *Wagner Bros. & Co.* v. *United States*, *supra*.
>
> In our view, the evidence in this case is sufficient to establish that the imported merchandise is a form of wood charcoal. The grinding of the charcoal and forming it into briquettes with the use of starch as a binder did not effect so significant a change in its physical characteristics or use as to indicate that it had become something more than wood charcoal. Cf. *John J. Coates Co. et al* v. *United States*, *supra*.

In a subsequent case, *James G. Wiley and Eijiu Sasajima* v. *United States*, 44 Cust. Ct. 346, Abstract 63822, the merchandise was shown to have the appearance of charcoal briquettes, but no evidence was presented as to its composition. In holding that the record was insufficient to establish that the merchandise was classifiable as wood charcoal, the court referred to the *Britton* case, stating (p. 347):

> In the course of the opinion, we cited a number of cases where it was held that charcoal in powdered or briquette form did not fall within the charcoal paragraph [citing cases]. In those cases, there was evidence that the additives

changed the character of the merchandise. In the *Britton* case, we held that the merchandise was a form of wood charcoal on the ground that the grinding of the charcoal and forming it into briquettes with the use of starch as a binder did not effect so significant a change in its physical characteristics or use as to indicate that it had become something more than wood charcoal.

In the instant case, the record establishes no more than that the merchandise had the physical appearance of charcoal briquettes and that it was used primarily for cooking. There is nothing to show whether the merchandise consisted wholly or primarily of wood charcoal; whether it contained other ingredients, and, if so, what their functions were. The evidence fails to establish that this merchandise was similar in all material respects to the merchandise in the *Britton case.* * * *

The question now before the court is whether charcoal briquettes containing both starch and clay are wood charcoal or something more than that.

The record establishes that starch alone or starch and clay together were used for the purpose of binding the ground charcoal together. Clay was used in place of starch alone in order to save expense. Both forms of briquettes were used for the same purpose— to charcoal broil steaks. However, the briquettes made with starch and clay were unsatisfactory, since they were very difficult to light.

Defendant urges that this factor indicates that the merchandise is something more than charcoal, on the ground that one of the characteristics of wood charcoal is its facile-igniting quality and on the further ground that charcoal with clay added could no longer be used for cooking.

Defendant relies upon *Marrash Bros.* v. *United States,* 29 Treas. Dec. 564, T.D. 35917. The merchandise, in that case, was invoiced as charcoal for censers and was claimed entitled to free entry under paragraph 447 of the Tariff Act of 1913, which provided for "Charcoal, * * * not suitable for use as a pigment." No evidence was offered to show that it was not suitable for use as a pigment, but it was established that the merchandise was composed of powdered charcoal and mucilaginous organic nitro compounds, which acted as an adhesive and caused more rapid ignition of the charcoal than would otherwise occur. The court stated (p. 565):

This testimony, in our judgment, removes the commodity in question from the charcoal paragraph, if, in fact, it was not removed by the failure of proof that it was not suitable for use as a pigment.

It is argued that since it was held, in the *Marrash* case, that the use of an additive in powdered charcoal, which resulted in a more rapid ignition than would ordinarily occur, removed the merchandise from the charcoal paragraph, the use of an additive which resulted in less rapid ignition than would ordinarily occur should remove the merchandise from the charcoal paragraph.

Although the decision, in the *Marrash* case, does not so state specifically, it seems apparent that the court thought the mucilaginous substances were added for the purpose of causing a more rapid ignition of the charcoal and that this was a desired result. The opposite is true in the instant case. Clay was not added to retard ignition and this was clearly not a desired, but a detrimental, result.

That merchandise may be charcoal whether or not it ignites readily is indicated by an article on charcoal in the Encyclopaedia Britannica, volume 5, page 244, where it is stated:

* * * While charcoal prepared at a high temperature is difficult to ignite, the product obtained by carbonization at, say, 300° C, retaining a considerable proportion of volatile inflammable matter, it ignites readily.

Although the briquettes involved herein were not as suitable for use in cooking as those made with starch only, no actual change in use for this merchandise has been shown. A somewhat similar situation was before the court in *C. J. Tower & Sons* v. *United States*, 47 CCPA 85, C.A.D. 734, which involved merchandise known as "Lioxin," consisting of 96 to 97 per centum vanillin and 3 to 4 per centum acetovanillone, with traces of other materials. It was claimed that the presence of acetovanillone and other materials took the merchandise out of the *eo nomine* provision for vanillin. In the course of the opinion rejecting this contention, the court stated (pp. 87–88):

Appellant also argues that the small amount of acetovanillone found in Lioxin is not an impurity but a useful ingredient, and that, accordingly, Lioxin is a mixture of synthetic odoriferous or aromatic chemicals and hence not classifiable under paragraph 28(a).

* * * While two witnesses testified that the presence of acetovanillone in Lioxin might be desirable for some uses, no specific use was suggested in which that would be true. On the contrary, the clear purport of the evidence as a whole is that Lioxin is used to obtain the same chemical reactions as U.S.P. vanillin, and for that purpose acetovanillone would be merely an impurity.

In the instant case, the only use shown for the merchandise was in charcoal broiling and, for that use, the presence of clay was an impurity or a detriment. It is well settled that a damaged article is classifiable under the *eo nomine* provision for that article, as long as it has not been evolved into something new. *Schade & Co.* v. *United States*, 5 Ct. Cust. Appls. 465, T.D. 35002; *Atwood-Stone Co.* v. *United States*, 5 Ct. Cust. Appls. 472, T.D. 35004; *Tower & Sons* v. *United States*, 11 Ct. Cust. Appls. 489, T.D. 39629; *Bush & Co. (Inc.)* v. *United States*, 12 Ct. Cust. Appls. 22, T.D. 39894; *C. J. Tower & Sons* v. *United States*, 36 Treas. Dec. 609, Abstract 42873; *H. A. Johnson Co.* v. *United States*, 21 Cust. Ct. 56, C.D. 1127; *C. J. Tower & Sons* v. *United States*, 24 Cust. Ct. 39, C.D. 1204.

*Atwood-Stone Co.* v. *United States*, *supra*, involved wheat, which had been stored in a damp condition and the germinating principle

destroyed. It was useless for the manufacture of any flour that would raise. In holding that the merchandise was still wheat, the court said (p. 473):

\* \* \* Nevertheless, the impairment of the physical components of the wheat and the destruction of the principle which made it available as seed affected the quality, not the essence, of the article, and it can not be said that either factor or both together destroyed the wheat or evolved something new which was not wheat. \* \* \*

In the instant case, the addition of clay impaired the quality of the article, but did not change it into something new which was not a form of charcoal. To hold otherwise, would have the anomalous result of allowing good quality wood charcoal free entry, but subjecting poor quality charcoal to duty. *Cf. Simpson* v. *United States,* 2 Ct. Cust. Appls. 222, T.D. 31952, where the court held it would be anomalous to accord normal cotton waste free entry but to impose a duty on an inferior cotton waste which had been processed from used cotton waste.

On the record presented, we hold that all of the merchandise involved herein is free of duty as wood charcoal under paragraph 1802 of the Tariff Act of 1930. The protests are sustained and judgment will be rendered for the plaintiff.