ATWOOD-STONE Co. v. UNITED STATES (No. 1414).[1]

STORED WHEAT, "BIN BURNED."

>    This wheat was stored in a damp condition and it heated and fermented and
> became "bin burned." To prevent further deterioration it was subjected to a
> process of dry heating. Notwithstanding the commodity had been "bin burned"
> and "dry heated" it remained essentially wheat and was bought and sold as
> wheat.—United States v. Devereux (135 Fed., 428) and Malouf v. United States
> (1 Ct. Cust. Appls., 437; T. D. 31502) distinguished.

United States Court of Customs Appeals, December 14, 1914.

APPEAL from Board of United States General Appraisers, Abstract 35531 (T. D. 34440).

[Affirmed.]

*Cassaday, Butler, Lamb & Foster* for appellant.
*Bert Hanson,* Assistant Attorney General (*Charles D. Lawrence,* special attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Merchandise invoiced as feed or condemned wheat and imported into the United States from Fort William, Canada, was classified as wheat by the collector of customs for the district of Superior, Wis., and assessed for duty at 25 cents per bushel under the provisions of paragraph 242 of the tariff act of 1909, which paragraph is as follows:

242. Wheat, twenty-five cents per bushel.

The importers protested that the importation was not wheat, but a nonenumerated unmanufactured article dutiable at 10 per cent ad valorem under that part of paragraph 480 of said act, which reads as follows:

480. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles, not enumerated or provided for in this section, a duty of ten per centum ad valorem, * * *.

The Board of General Appraisers overruled the protest and the importers appealed.

The testimony submitted to the board by the importer was to the effect that the product under consideration was wheat which had been "bin burned" by reason of the fact that it had been stored in a damp condition. Stored in that state a heating or fermentation of the wheat set in, which shriveled the grain and gave it an unpleasant odor. To prevent further deterioration the product was then subjected to a process of dry heating, which apparently removed the odor and not only checked the fermentation but precluded its recrudescence. The "bin burning" of the wheat and the processing to which it was submitted discolored the grains, made them

---

useless for the manufacture of white flour or of any flour which would raise, and reduced the value of the article from about 80 cents a bushel to 50 cents a bushel. With the exception that the grains were slightly shriveled, they retained, however, the characteristic form and all the physical constituents peculiar to wheat. Some of the corporeal elements of the cereal were unquestionably impaired by storing it while damp. The germinating principle in a large percentage of the grains and the elastic entangling characteristics of the gluten were certainly destroyed by the dry-heat treatment to which the product was subjected in order to stop fermentation. Nevertheless, the impairment of the physical components of the wheat and the destruction of the principle which made it available as seed affected the quality, not the essence, of the article, and it can not be said that either factor or both together destroyed the wheat or evolved something new which was not wheat. So far as we can discover from the testimony and from the evidence afforded by the samples, the commodity, notwithstanding that it had been "bin burned" and "dry heated," was still wheat, had a marketable value as wheat, and was bought and sold as wheat. True, it was called feed or condemned wheat, but that designation indicated a grade of wheat rather than an entity or substance which was not wheat, as is shown by the testimony of H. G. Atwood, president of the American Milling Co., Carl S. Miner, and W. A. Scott, witnesses for the importers, who testified as follows:

H. G. Atwood:

Q. You don't mean to say that there is no wheat but the milling wheat?—A. Milling wheat, condemned wheat, feed wheat.

Carl S. Miner:

Q. (By Mr. WEMPLE.) You call this wheat, don't you?—A. Yes, sir, I call it wheat; I call it feed wheat.

W. A. Scott:

Q. What is it fit for?—A. It is feed wheat, just the same as feed barley. It is damaged wheat.

Q. What do you mean by feed wheat?—A. Feed wheats are all wheats that are not fit to be manufactured into flour. Marketable wheat, not fit for flour.

To support their contention that the merchandise is not wheat the importer cites Abstract 19941 (T. D. 29339), United States *v.* Devereux (135 Fed., 428), and Malouf *v.* United States (1 Ct. Cust. Appls., 437; T. D. 31502).

In the first two cases it was apparently held that a commodity invoiced as feed screenings in the one case and wheat screenings in the other, and which was worthless for seeding or for the manufacture of human food could not be classified as wheat. Without passing upon the soundness or unsoundness of that rule, it is sufficient

to say that it has no applicability to the goods involved in this appeal, for the reason that it affirmatively appeared from the evidence that from 12 to 20 per cent of the importation still retained the power of germinating, and there was no testimony from which it could be fairly concluded that the importation might not be used for the making of some kind of breadstuffs. The discoloration of the grains and the impairment of the gluten certainly did preclude its use for the manufacture of a white flour which would "raise," but from the fact that it was not available for the manufacture of such a flour it can not be deduced that it was unavailable for the production of breadstuffs similar to those which are made from cornmeal, rye, oats, or barley. The term "bread" is not confined to those breadstuffs which are made from white flour or from flour which will "raise," but is broad enough to cover all articles of food made from the flour or meal of grain, whether it will "raise" or not.

The merchandise which was the subject of controversy in the case of Malouf v. United States was not at all of the same character as that here involved. The merchandise there involved was really a manufacture of wheat, produced by boiling, drying, and grinding the grain. That treatment, as appears from the decision, not only destroyed the form but eliminated the bran and enveloping tissues which are characteristic of wheat. So much was the original material modified by the process of manufacture to which it was subjected that, as was said in that decision, it no more produced the "impression or mental picture of wheat than would crushed amber."

In our opinion the merchandise imported is an inferior grade of wheat, and of the issue here involved we can say with confidence what was said by Judge Lochren in the Devereux case:

> The single question is whether this article is wheat. No distinction as to grades of wheat, is made by the tariff. A sample of the article shows the grains of which it is composed, and any person looking at such sample would unhesitatingly pronounce it to be wheat, somewhat injured.

The decision of the Board of General Appraisers is *affirmed*.