CONSOLIDATED ELEVATOR CO. *v.* UNITED STATES (No. 1861).[1]

1. CONSTRUCTION, PARAGRAPH 212, TARIFF ACT OF 1913—"IMPURITIES."
    The proviso of paragraph 212, tariff act of 1913, "that no allowance shall be made for dirt or other impurities in seeds provided for in this paragraph" should be so

construed as to limit the "other impurities" to such as correspond to the one named, at least in the essential particular of having no separate tariff status for dutiable purposes. It should not be so construed as to abrogate the rule that where two or more articles subject to different tariff rates are present in an importation they may be separately assessed at the several rates provided for each.

2. SCREENINGS.

Screenings are a distinct nonenumerated unmanufactured article, subject to tariff duty under paragraph 385 of the act of 1913.

3. SEGREGATION.

Actual physical separation is not essential to segregation for tariff purposes.

4. CONSTRUCTION, PARAGRAPH 212, TARIFF ACT OF 1913—"ALLOWANCE."

"Allowance" (par. 212, tariff act of 1913) refers to draft or tare or some abatement from the full weight of imported merchandise. Segregation is not an "allowance."

5. FLAXSEED BEFORE SCREENING.

Flaxseed was imported as it comes from the farms, containing a percentage of wild buckwheat, wild mustard, wheat, barley, oats, chaff, and foxtail, but practically no dirt. After importation, the commercial practice is to separate the commodity into flaxseed and screenings, each being bought and sold as such. The percentages of flaxseed and of screenings were shown. The flaxseed is dutiable as such under paragraph 212, tariff act of 1913, and the screenings as a nonenumerated unmanufactured article under paragraph 385.

## United States Court of Customs Appeals, February 8, 1918.

APPEAL from Board of United States General Appraisers, G. A. 8072 (T. D. 37247).

[Reversed.]

*Davis, Severance & Olds* for appellants.
*Bert Hanson,* Assistant Attorney General, for the United States.

[Oral argument Dec. 12, 1917, by Mr. Severance and Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

The appellants made two separate importations of the commodity entered as flaxseed and screenings.

The testimony shows that flaxseed as it comes from the farms to the elevators contains a percentage of wild buckwheat, a percentage of wild mustard, a percentage of wheat, and small percentages of barley, oats, chaff, and foxtail. There is practically no dirt in the product. These substances, according to the regular commercial practice, are separated from the flaxseed, making a commercial product known as screenings.

These screenings are bought and sold in the markets in large quantities. The flaxseed so separated from the screenings is likewise handled and sold, and is, in fact, the commercial product known as flaxseed.

The different seeds found in the screenings may be used for various purposes. If it is practically feasible to separate out what small or broken grains of wheat there may be in the screenings, they are, to

a limited extent, used for milling purposes. Likewise any mustard seed present may be used to some extent for extracting oil from them. As an ordinary, practical matter, however, all of these screenings are used for stock food on farms. That is, the screenings, as such, without any further or secondary separation and without being subjected to any further process, constitute in themselves a merchantable commercial product which is put upon the market and sold for feeding stock.

The percentage of screenings varies in different importations, but in the present was stated to be in the different cars from 5 to 9 per cent. The collector at the port of importation, Duluth, acting under directions of the Secretary of the Treasury, imposed a duty of 20 cents per bushel on the entire importation, on the ground that the screenings should be treated as impurities. On appeal to the Board of General Appraisers this action of the collector was affirmed. The question, therefore, presented for our determination is whether under the act of 1913 these screenings, which the testimony shows constitute a separate commodity, sold as such, although commingled with flaxseed at the time of importation, are to be assessed as flaxseed or as the commodity which they in fact commercially are known to be. Or, stated in another way, the question is whether permitting a separation of these two commodities into flaxseed and screenings, respectively, in the proportion which each represents in the entire importation amounts to an allowance for dirt or other impurities.

The paragraph in question is 212 of the tariff act of 1913, and reads as follows:

Flaxseed or linseed and other oil seeds not specially provided for in this section, 20 cents per bushel of fifty-six pounds,

with a proviso at the end of the section as follows:

*Provided*, That no allowance shall be made for dirt or other impurities in seeds provided for in this paragraph.

The definition of "impure" in Murray's New English Dictionary is:

1. Containing some defiling or offensive matter; dirty, unclean, * * *.
2. Mixed with or containing some extraneous or foreign matter, esp. of an inferior or baser kind; contaminated, adulterated.

And in Webster's New International Dictionary the definition of "impure" is—

Not pure; specif. a. Containing something which is unclean; dirty; foul; filthy; unwholesome; as, impure water or air. b. Mixed or impregnated with extraneous, esp. inferior, substances; adulterated; as impure drugs, food, etc.

It would appear that the word "impurity" as used in this tariff act is open to two constructions. It may and often does mean any matter not of the character of the principal matter. It may be given a narrower meaning, as signifying some substance inherently impure or unsalable.

This precise question has not before engaged our attention. The question of allowance for wantage or deductions from full weight on account of impurities has been considered in various cases in this court, which cases have dealt with importations as to which allowance was claimed on account of the presence of nondutiable extraneous matter. In such cases, following Seeberger v. Wright (157 U. S., 183), we have held that in the absence of statutory inhibition an allowance was permissible, subject, however, to commercial usage to the extent that where by commercial custom a certain percentage of extraneous matter was paid for in commercial transactions as a part of the imported substance, the allowance was restricted, as in the case of United States v. Baker Castor Oil Co. (2 Ct. Cust. Appls., 338; T. D. 32076), to the excess of impurities over the usual amount. Undoubtedly such a provision as that we are considering would require denial of any allowance whatever for impurities, which, within the rule of ejusdem generis, were of like kind with those specifically enumerated. We are impressed, however, that this rule calls for a limitation of the impurities, allowance for which is proscribed, to such as correspond with the one named, at least in the essential particular of having no separate tariff status for dutiable purposes, and that the proviso should not be so construed as to abrogate the rule that where two or more articles subject to different tariff rates are present in an importation they may be separately assessed at the several rates provided for each, as was done in United States v. Waterhouse (1 Ct. Cust. Appls., 353; T. D. 31452), citing United States v. Ranlett (172 U. S., 133). See also United States v. Myers (140 Fed., 648), In re Seaboard Rice Milling Co. (T. D. 34843), and a ruling of the Treasury in T. D. 37187.

An attempt is made to distinguish the case of Seaboard Rice Milling Co. from the instant case, as it is said that in the Rice Milling Co. case there were two mixed commodities, each being a recognized commercial commodity at the time of importation. This is true, but we do not think that on the record in this case the Rice Milling Co. case is distinguishable in that particular. In the present case the screenings are a distinct commercial commodity, commingled with other dutiable flaxseed, it is true, as were the cheaper grades of rice with those of better quality in the Rice Milling Co. case. But in that case actual physical separation was not deemed necessary before there could be separate assessment, and if not required in that case, no more should it be required in the present case, both the lower grades of rice in that case and the screenings in the present case being commercial commodities subject to a different rate of duty.

In the case of T. D. 37187, a ruling by the Assistant Secretary of the Treasury, it was held that wheat screenings, which were a part of an importation of wheat, wheat being free at the time, were subject to separate assessment and to duty as a nonenumerated unmanufactured

article under paragraph 385 of the tariff act of 1913.   This case is referred to as showing that screenings are a distinct unenumerated unmanufactured article, subject to tariff duty, and that that is true even though they are found commingled with other articles—in that case an article not subject to duty, in the present case an article subject to duty—but the screenings alike dutiable in either case. No reason suggests itself why, if screenings may be estimated and taxed when mixed with free goods, they may not be taxed at the appropriate rate (and that only) when mixed with dutiable goods. It is not to be assumed that the Congress, by this enactment, sought to enlarge the scope of the provision taxing flaxseed to include a separate merchantable commodity much inferior, nor is it to be lightly assumed that the proviso in question was designed to punish the importer for accidental commingling of goods by refusing to apply the proper rate to each when the practice admits of segregation for this purpose in the case of other goods.

But it is urged that to assess these screenings at the proper rate instead of the rate imposed upon flaxseed would lead to absurd results, and to illustrate this claim it is said that if the importation contained 6 per cent of dirt it would be dutiable at full weight as flaxseed, whereas if of 6 per cent of screenings, dutiable as such at 10 per cent, the latter importation would bring less revenue than the former.   If it is argued that in the light of this illustration it is inequitable to levy a tax on the two commodities at the rate affixed to each by the tariff act, we reply that the argument is not convincing; that we can not impute to Congress a purpose to so punish an importer.   The record discloses, however, that such a case as that supposed does not occur in actual importations, as with modern methods of treatment practically all dirt is eliminated from the seed by the fanning mill.

It may be well to refer briefly to the history of this provision.   In the act of 1897, in paragraph 254, there was a provision reading as follows:

Flaxseed or linseed and other oil seeds not specially provided for in this act, 25 cents per bushel of fifty-six pounds.   * * *   Nor shall any allowance be made for dirt or other impurities in any seed.

It appears that during the existence of this act, for the purposes of assessment the screenings were separated from the flaxseed and no duty was assessed on such screenings, but the 25 cents per bushel was assessed upon the net flaxseed.   In 1909, paragraph 266 provided for seeds, including flaxseeds, but the inhibition against allowance for impurities was omitted.

In T. D. 31177, in a letter addressed to the collector of customs at St. Paul, the Assistant Secretary of the Treasury expressed the view that an allowance for impurities should be made in estimating

the quantity of flaxseed imported, but that if the impurities found in such seed had any commercial value, and were of a character which, if imported separately, would be subject to duty, duty should be assessed thereon.

It would appear, therefore, that under the act of 1897 duty was not demanded upon merchantable screenings which if imported separately would be subject to duty, but the screenings were burned Under the act of 1909 the practice of burning the screenings was departed from and duty was assessed upon the screenings as though they were imported separately.

In view of this history, the readoption of the provision in 1913 forbidding the allowance for impurities does not import a prohibition against a separation of screenings from the flaxseed in fixing the duty upon both. Such separate assessment would be in line with the construction under the act of 1897 in so far as it relates to the imposition of duty upon the flaxseed, as under that law the practice was to assess upon the *net* flaxseed, not treating the screenings, which constituted a separate commercial commodity, as impurities. The same practice continued under the act of 1909 until the attention of the Secretary of the Treasury was called to the fact that here was a commercial commodity being destroyed apparently because the collector did not know how to treat it, and then it was promptly held that a duty should be imposed under the nonenumerated unmanufactured articles clause upon the screenings.

The history of this is given in a letter of the Treasury Department (T. D. 34537), and after reciting the action of the department under the tariff act of 1909, the letter states:

The department is of the opinion, on consideration of the question, that as flaxseed and screenings are separate commodities, though the screenings are mingled with the flaxseed, if the screenings are of commercial value, duty may be assessed separately on the flaxseed and the screenings, and that such a separate assessment of duty does not constitute an "allowance" within the meaning of the term as used in the said paragraph 212 of the tariff act.

In the same letter the Assistant Secretary held:

If the impurities in the flaxseed do not have a commercial value or are of a character which if imported separately would not be subject to duty, a separate assessment of duty should not be made thereon, but the whole shipment on its entire weight as imported should be accounted for as flaxseed.

This decision of the Secretary, we think, states a reasonable rule, and while in a letter (T. D. 36948) the Assistant Secretary advised that "inasmuch as the proper classification of this merchandise is not free from doubt and has not been before the Board of United States General Appraisers for decision under the present act, the department has reached the conclusion that it should be the subject of judicial construction," and direction was given that flaxseed mingled with screenings imported or withdrawn from warehouse should

be assessed on full weight even though in part of a separate commodity susceptible of reasonable identification as screenings.

If the question were one of serious doubt, the importers would be entitled to the benefit of that doubt. But we think it may well be said that the importers are not here seeking an allowance. The word "allowance" has come to mean either an allowance for draft or tare or some abatement from the full weight of imported merchandise. That is not what is being sought here. Potential separation of the two commodities mingled together of necessity for the purpose of importation is all that is asked, and this is for the purpose of enabling the importer to pay a tariff upon each of the commodities which in use will have a separate existence. To refuse this would be either to impose an additional burden upon the importer in the way of a tariff tax or would compel the importer to cause the separation of the screenings from the flaxseed before importation, which would mean, as is pointed out by the testimony, a diversion of the commerce in flaxseed from this country wholly to Canadian routes. A commodity which has a value such as have the screenings in question here can hardly appropriately be said to be an impurity. It is not the major commodity in value appearing in the importation, but it is a thing of substantial value, and as such subject to tariff duty. It is quite a different thing than something that has no such value and is destroyed.

We do not rest our decision on the practical construction of the present act by the administrative officers, as the evidence shows that in some of the ports screenings were assessed at the rate imposed upon flaxseed and as part and parcel of that commodity. It can not be, therefore, that the practice has been uniform. The opinion of the Assistant Secretary of the Treasury (T. D. 34537) is cited by us not as establishing a controlling custom, but as stating what we deem the reasonable rule.

The decision of the Board of General Appraisers is *reversed*.