WILLIAMSON *v.* UNITED STATES (No. 1809).     UNITED STATES *v.* WILLIAMSON (No. 1810).[1]

WHEAT—WHEAT SCREENINGS—PARAGRAPHS 644 AND 385, TARIFF ACT OF 1913.

Wheat "scalpings" or screenings, the residue after screening from wheat as it comes from the thrasher all the merchantable wheat—a commodity composed of

---

[1] T. D. 37538 (34 Treas. Dec., 161).

buckwheat, rapeseed, mustard seed, flaxseed, dust, dirt, and shriveled, broken, and spoiled wheat kernels—not sold or used as wheat, but bought and sold as wheat screenings and used as sheep feed, or as an ingredient in the manufacture of chicken feed, are dutiable as a nonenumerated unmanufactured article under paragraph 385, tariff act of 1913. They are not "wheat" within the meaning of paragraph 644. It being shown that the wheat content can not, as a commercial practicability, be separated, and that, even if that were done, it could not be marketed as wheat, segregation and dutiability under paragraph 644 can not be had.

United States Court of Customs Appeals, February 8, 1918.

Cross appeals from Board of United States General Appraisers, G. A. 8007 (T. D. 36898).

[Modified.]

*Bert Hanson*, Assistant Attorney General (*Samuel Isenschmid* and *John J. Mulvaney*, special attorneys, of counsel), for the United States.
*Gerry & Wakefield*, contra.

[Oral argument Oct. 18, 1917, by Mr. Mulvaney and Mr. Wakefield.]

Before Montgomery, Smith, Barber, De Vries, and Martin, Judges.

Smith, Judge, delivered the opinion of the court:

Importations at the ports of Buffalo and New York entered in some cases as "wheat screenings, scalpings," and in others as "wheat scalpings, screenings," were classified by the collector of customs as "wheat" and because of the duty imposed by Canada on wheat coming from the United States were held to be dutiable at 10 cents per bushel, under the provisions of paragraph 644, of the free list of the tariff act of 1913, which is as follows:

644. Wheat, wheat flour, semolina, and other wheat products, not specially provided for in this section: *Provided*, That wheat shall be subject to a duty of 10 cents per bushel, that wheat flour shall be subject to a duty of 45 cents per barrel of 196 pounds, and semolina and other products of wheat, not specially provided for in this section, 10 per centum ad valorem, when imported directly or indirectly from a country, dependency, or other subdivision of government which imposes a duty on wheat or wheat flour or semolina imported from the United States.

The importer protested that the merchandise was not "wheat" and that the importations were dutiable at 10 per cent ad valorem either under said paragraph 644, as a wheat product, or as a nonenumerated, unmanufactured article under paragraph 385, of the same act, which reads as follows:

385. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for in this section, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not provided for in this section, a duty of 15 per centum ad valorem.

The Board of General Appraisers found that 69.388 per cent of the importation covered by protest No. 796591, 62.18 per cent of the importation covered by protest No. 798475, and 71.156 per cent of the importation covered by protest No. 798476, was "wheat," and

held that such percentages of the several importations were dutiable at 10 cents per bushel under the provision of paragraph 644.

It was further decided by the board that the part of each importation which remained after deducting the wheat content was a nonenumerated, unmanufactured article, dutiable at 10 per cent ad valorem under paragraph 385.

The protests were accordingly overruled as to the percentage of each importation found to be wheat and sustained as to that which was not.

Both the Government and the importers were dissatisfied with the decision of the board—the one, because all of the merchandise was not classified as wheat, and the other because any of it was so classified. Accordingly, cross appeals were filed by both parties, and we are now called upon to determine whether the whole or any part of the importation is wheat within the meaning of the tariff act of 1913.

It appears from the uncontradicted testimony that wheat as it comes from the thrasher contains a certain quantity of dust or dirt, as well as a percentage of rapeseed, mustard seed, and other things which grow with the wheat and are characteristic of it because of the locality in which it is produced. Such a commodity not further processed than thrashing would be commonly known as wheat, if wheat were the predominant component. The product in controversy is not produced in that way, however, inasmuch as it is not the result of thrashing the grain heads reaped from the field but of a process subsequent to thrashing, known as "screening," which is applied to the thrashed material for the purpose of separating, as far as practicable, the merchantable wheat from the impurities and undesirable grains commingled with it as it came from the thrasher. The result of such screening, in the present case, was a conglomerate composed of buckwheat, rapeseed, mustard seed, flaxseed, dust, dirt, and of shriveled, broken, and spoiled wheat kernels. This mass of dissimilar elements the board regarded as mixed goods, the wheat content of which it subjected to a duty of 10 cents per bushel and the remainder to a duty of 10 per cent ad valorem as a nonenumerated, unmanufactured article.

The Government argues that the whole importation should be classified as wheat, because wheat is the principal component, and because the merchandise is an entirety composed of substances natural to the wheat and not severable or segregable from it as a commercial proposition.

We do not think that either the decision of the board or the contention of the Government can be sustained on the evidence disclosed by the record.

William J. Brainerd testified for the importers that he was a grain merchant and broker and that he had bought and sold wheat at wholesale in Boston, Chicago, and New York for the 17 years proir to May 16, 1916; that he had handled wheat from practically every market and every grain center in the United States; that he knew the meaning of the word "wheat" as it was used in the wholesale trade in this country prior to October 3, 1913, and that the importation in controversy was not, prior to that date, included in the term wheat by the trade or bought or sold in this country by the wholesale trade as wheat, but as wheat screenings, scalpings, or offal, according to quality.

He said that the screenings were the rapeseed, mustard seed, dust, dirt, and other substances which had been removed from the wheat by screening. He stated that screenings were not used for human consumption or for seed but as chicken feed, or as a component of chicken feed, and then only after cleaning out the dust and dirt.

The witness further testified that there was a grade of wheat known as "no-grade" wheat, which covered either a low grade of wheat not up to the requirements, or a wheat for which there was no especial grade. He declared, however, that the wheat in the product in issue could not be used as commercial wheat; that all grades of wheat had been cleaned out of it, and that because of the wild oats, rapeseed, mustard seed, dust, dirt, and other things which it contained it could not be classified even as "no-grade" wheat. He said that no grade of wheat contained the proportion of foreign matter found in the importation and that screenings, of the kind imported, were neither sold as wheat nor known as commercial wheat. He admitted that some "no-grade" wheats did contain a small percentage of screenings, but that the percentage of screenings in the importation precluded its sale on sample as "no-grade" wheat. He also said that he was of the opinion that if the goods under consideration were further cleaned they could not be brought to the commercial status either of grade or "no-grade" wheat.

L. G. Leverich testified on behalf of the importers that he was a grain dealer and an operator of a grain elevator and had been in the business of buying and selling wheat at wholesale in all the grain markets in the United States for the 28 years immediately prior to May 16, 1916. He said that he had bought and sold wheat screenings for many years prior to October 3, 1913, and that goods of the kind imported were known and designated by the wholesale trade of the United States, prior to October 3, 1913, as wheat screenings and that wheat screenings were the screenings of wheat. He said that the wheat was not screened during the process of thrashing, but subsequently at the grain elevators.

According to this witness, "no-grade" wheat embraced all kinds and varieties of wheat which are above or below the fixed standards of the trade; that is to say, wheat which is too poor or too good for any grade. "No-grade" wheat is bought and sold on samples. He positively declared, however, that under no condition would the importation be considered wheat.

William H. Kemp, a grain merchant ever since 1879, engaged in buying and selling wheat in large quantities prior to October 3, 1913, testified on behalf of the importers that the official samples of the goods, which were the subject of protest, "would never be designated as wheat" by the wholesale trade and commerce of the country.

The witness said that his firm cleaned wheat by screening it and that such screenings and screenings of wheat in general were used in the manufacture of chicken feed. He stated that "no-grade" wheat is wheat that does not come within any standard established by the various exchanges, but that it is not specifically a low-grade wheat.

He testified that the screenings under consideration were not "no-grade" wheat and were so far below that grade that they could not be so classified.

G. H. K. White, inspection chief of the New York Produce Exchange for 27 years prior to May 16, 1916, testified that he was brought in contact with the wholesale grain dealers of the United States and with their transactions during all that period; that he was familiar with the different grades of wheat; that the official samples in this case were not wheat, as that term was used in the wholesale trade prior to October 3, 1913. He said that the samples were wheat screenings and that such screenings are usually sold to feed elevators to mix with other stuff for the manufacture of chicken feed.

Chauncey E. Foster testified for the importers that he was a flour merchant and inspector of the Hecker-Jones milling business, with which company and the parent company he had been connected since 1888. He said his duties require him to inspect the wheat before purchase; that he has charge of the laboratories where wheat tests are made; that he had made a special study of the chemistry of wheat; and that he lectured on the chemistry and the uses of wheat to the domestic-science classes of Columbia University, Pratt Institute, and the New York University. He said that he had made a study of the screening of wheat and its development and types, and that for four years prior to 1906 he had bought and sold wheat in Minneapolis. In New York he supervised the buying and selling of wheat for the firm. He said that the official samples were not fit for food; that a small percentage, if any, would germinate, and that such screenings, if planted, would produce cockle, oats, rapeseed, flaxseed, and large proportions of small "broken" wheat. He said that in the western country screenings were used principally

for sheep feed, and that they were also employed as an ingredient in the making of chicken feed.

L. G. Leverich, recalled on behalf of the importers, testified that screenings, such as those imported, were sold in the market just as they were and that before manufacture into chicken feed they were dusted up and that the product could not be used for flour or human food. He said it would not be commercially profitable to separate the wheat from the other substances.

He was of the opinion that, although the analysis of the screenings showed 69 to 71 per cent of wheat, a very large percentage of the sample was so much shrunken or broken that it would never be considered as wheat by the trade. He said that wheat screenings within three months prior to his testimony were selling at 78 cents for 60 pounds, while very poor grade wheat, bin-burnt wheat, was selling at $1.01 to $1.10 for 60 pounds, and good winter wheat at from $1.40 to $1.50 a bushel.

That testimony was not contradicted or impeached and we think it very clearly established—·

First, that the screening of wheat has for its purpose the separation of wheat from its impurities and the undesirable shriveled and broken grains which are mixed with it as it comes from the thrasher.

Second, that the screening process results in the production of commercial wheat and a product commercially known as wheat screenings.

Third, that it is not commercially practicable to remove the shriveled, broken, and defective wheat grains from the screenings, and that such screenings are dealt with by the trade as an entirety and are bought and sold at wholesale as wheat screenings, scalpings, or offal, according to quality.

Fourth, that wheat screenings are not bought and sold by the trade as wheat and are not wheat as that term is understood by the trade of the country.

We must, therefore, hold that the screenings are not wheat in trade and commerce and that consequently they can not be subjected to the duty prescribed for wheat by the tariff act.

Inasmuch as the screenings were not produced by any process of manufacture, but were simply identified by sifting and separating them from the commercial wheat with which they were mechanically mixed, they must be regarded as an unmanufactured article. Screenings not having been elsewhere provided for fall within the provisions of paragraph 385, and as they are not manufactured they are dutiable as a nonenumerated unmanufactured article, as therein prescribed.

The cases of Schade v. United States (5 Ct. Cust. Appls., 465; T. D. 35002) and Atwood-Stone Co. v. United States (5 Ct. Cust. Appls.,

472; T. D. 35004), cited by the Government and referred to by the board in its decision, differ radically from the case at bar and can not be applied to the facts presented by the record in this appeal. Neither of those cases dealt with screenings and both of them with wheat. The first with "no-grade" wheat, which was a grade of wheat, and the second with "bin-burnt" wheat, which was admittedly bought and sold as wheat.

In so far as the decision of the Board of General Appraisers holds any of the screenings to be wheat, it is reversed, and in so far as it holds the screenings to be dutiable as a nonenumerated unmanufactured article, it is *affirmed.*