(C. D. 1715)

UNIVERSAL LABORATORIES *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 7, 1955)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*Joseph E. Weil*, trial attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

EKWALL, Judge: The merchandise in this case consists of what is described as "ergoty screenings," imported at the port of Noyes, Minn. The collector assessed duty thereon under the *eo nomine* provision for screenings in paragraph 731 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, at the rate of 2½ per centum ad valorem.[1]  It is claimed by

| [1] Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 731 | Screenings, scalpings, chaff, or scourings of wheat, flaxseed, or other grains or seeds: Unground, or ground | 2½% ad val. |

the plaintiff herein that the merchandise consists of screenings and ergot and that the latter commodity should have been segregated and allowed free entry under paragraph 1728 of the said tariff act.[2] It has been stipulated by counsel that the percentages of ergot found by the United States Customs Laboratory in Chicago were the actual percentages of ergot in these shipments. Those percentages are as follows:

| Entry No. | Ergot content |
|-----------|---------------|
| 5249–A | 5.8 per centum |
| 717–A | 34.6 per centum |
| 2109–A | 52.9 per centum |

The law applicable to commingled goods, in effect at the time the merchandise covered by entry 5249–A was imported (June 19, 1953), section 508, Tariff Act of 1930 (19 U. S. C. § 1508), was as follows:

Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise can not be readily ascertained by the customs officers, the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof, unless the importer or consignee shall segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained.

As amended by the Customs Simplification Act of 1953 (Public Law 243, 83d Congress), which was made effective September 7, 1953, and is applicable to entries 717–A and 2109–A, this section reads as follows:

(a) Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise cannot be readily ascertained by the customs officers (without physical segregation of the shipment or the contents of any entire package thereof), by one or more of the following means: (1) Examination of a representative sample, (2) occasional verification of packing lists or other documents filed at the time of entry, or (3) evidence showing performance of commercial settlement tests generally accepted in the trade and filed in such time and manner as may be prescribed by regulations of the Secretary of the Treasury, and if the consignee or his agent shall not segregate the merchandise pursuant to subsection (b), then the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof.

(b) Every segregation of merchandise made pursuant to this section shall be accomplished by the consignee or his agent at the risk and expense of the consignee within thirty days after the date of personal delivery or mailing, by such employee as the Secretary of the Treasury shall designate, of written notice to the consignee that the merchandise is commingled, unless the Secretary authorizes in writing a longer time. Every such segregation shall be accomplished under customs supervision, and the compensation and expenses of the supervising customs officers shall be reimbursed to the Government by the consignee under such regulations as the Secretary of the Treasury may prescribe.

---

[2] PAR. 1728. Nux vomica, gentian, sarsaparilla root, belladonna, henbane, stramonium, and ergot.

(c)   The foregoing provisions of this section shall not apply with respect to any part of a shipment if the consignee or his agent shall furnish, in such time and manner as may be prescribed by regulations of the Secretary of the Treasury, satisfactory proof (1) that such part (A) is commercially negligible, (B) is not capable of segregation without excessive cost, and (C) will not be segregated prior to its use in a manufacturing process or otherwise, and (2) that the commingling was not intended to avoid the payment of lawful duties or any part thereof. Any merchandise with respect to which such proof is furnished shall be considered for all customs purposes as a part of the merchandise, subject to the next lower rate of duty (including a free rate), with which it is commingled.

(d)   The foregoing provisions of this section shall not apply with respect to any shipment if the consignee or his agent shall furnish, in such time and manner as may be prescribed by regulations of the Secretary of the Treasury, satisfactory proof (1) that the value of the commingled merchandise is less than the aggregate value would be if the shipment were segregated; (2) that the shipment is not capable of segregation without excessive cost and will not be segregated prior to its use in a manufacturing process or otherwise; and (3) that the commingling was not intended to avoid the payment of lawful duties or any part thereof. Any merchandise with respect to which such proof is furnished shall be considered for all customs purposes to be dutiable at the rate (including a free rate) applicable to the material present in greater quantity than any other material.

Apparently, the collector of customs decided that the respective quantities of the commingled merchandise could not readily be ascertained.

In support of its claim, plaintiff introduced the testimony of two witnesses. The first of these, who described himself as the owner of the Universal Laboratories, plaintiff herein, stated his business and that of the plaintiff as "separating ergot from screenings," in which business he had been engaged since 1938. His testimony was substantially as follows: He buys screenings, also called "feed oats," "mixed feed oats," "mill oats," and "scalpings." He produced, and there was received in evidence as illustrative exhibit 1, a sample typical in appearance to the screenings which the witness imports, although the percentages of ergot and grain will vary. After the screenings are received at plaintiff's plant, the ergot is separated by machinery from the screenings. In purchasing these screenings, the percentage of ergot determines the price to be paid. Ergoty screenings are bought in the form of screenings, that is, mixed with grains, because that is the only way in which the ergot can be bought. Ergot, as such, is found in the field with the other grains. Ergoty screenings are a byproduct of the rye industry. The farmer takes his rye, which naturally contains weeds (quite a bit of which consists of wild oats), to the elevator. There it is run through cleaners which take out the ergot, the oats and weed seeds, such as mustard, for instance. The elevator man wants to ship rye, which he wants as clean as possible, in order that it may grade as rye. Plaintiff buys the part which contains the oats and the ergot. The witness explained the

method of sampling which is used in order to determine the percentage of ergot upon which the purchase price is to be based. He described this as a recognized method in the grain trade. The sample is—

\* \* \* taken by means of a probe. It is stuck down into the car, down to the bottom, and you get a sample from all parts of the car and all depths of the car.

\*       \*       \*       \*       \*       \*       \*

Then we mix that, we put it together in a pile or basket, or whatever you want to call it, and mix it and keep mixing it. And from the final—we start out with about—I'm saying the way we do it. We start off with about—after we are through probing we'd have about 8 or 10 quarts, and we keep mixing that and dividing it so we end up with about two quarts. And from that we take our 100 grams or 500 grams. And then after that it's hand-sorted and by means of a scale it's computed.

From the representative sample, a portion is spread out, and the various components are separated by hand. If, for instance, a sample of 100 grams has been selected, the ergot separated from that is weighed to determine the percentage upon which to base the purchase price. In the case of a carload of grain, the complete operation of sampling and determining the percentage of ergot could easily be accomplished in half an hour.

"Screenings" is a well-known article of commerce traded on grain exchanges floor. The article traded in by plaintiff, i. e., ergoty screenings, is a different product from screenings. It contains ergot and is very much higher in price. In settling upon the price of ergoty screenings from Canada, the inspection certificate, issued by the Canadian Government, is accepted; the settlement is made upon the basis of that certificate. In the case of a domestic product, if the commodity goes through the grain exchange and is sampled by the Minnesota inspector, plaintiff accepts his word. It is hauled directly from a country elevator to plaintiff, then a sample is taken in conformity with the official grain standards of the United States, the percentage is computed, and settlement is made on that basis. The method of sampling is contained in a publication entitled "Handbook of Official Grain Standards of the United States" (exhibit 2). There was also admitted as exhibit 3 the publication "Grain Grading Primer," issued by the United States Government, together with a sample (exhibit 4), representing the condition of the ergot after it has been separated from the screenings. Ergot, as represented by said exhibit 4, is sold by plaintiff to a manufacturing druggist as a crude drug, from which the druggist makes a medicinal product. The remainder of the imported screenings, after the removal of the ergot, is sold as feed oats or mixed feed oats, which latter term is synonymous with the term "screenings."

On cross-examination, this witness stated that the business of Universal Laboratories is solely the purchase of screenings, from which

it extracts the ergot and sells both the ergot and the mixed feed oats; it handles no other products. In order to remove the ergot, the screenings are put through three machinery processes. The ergot, after separation, is shipped to the manufacturing druggist. It also sells the feed screenings.

On redirect, the witness stated that the term "screenings" would include anything that comes from a grain cleaner, including ergot. Screenings that contain ergot the witness calls ergoty screenings. He described ergot as a diseased kernel of rye, "In other words, there was an infection dropped into the flower of the flowering head and instead of a kernel of rye producing" a kernel of rye this ergot body was produced. From 1 to 12 or 15 of them may be found on a head. In reply to questions by the court, the witness stated that only the ergot from rye can be used under the U. S. P. regulations.

Plaintiff's second witness described himself as a grain trader on the trading floor, engaged in buying and selling grain on the Minneapolis Grain Exchange. He has physically handled wheat, flax, corn, rye, barley, oats, mill oats, and screenings. The last-named term is used interchangeably with the term "mixed feed oats." In the grain trade, the term "screenings" is applied to any product that has been screened from some sort of grain. There are various classes of screenings. The witness had handled and bought and sold ergoty screenings. Before becoming a grader, he was an inspector, and, as such, he "actually graded carloads and lots of grain by physically grading them, arbitrating the samples from various cars and lots, by hand, as indicated by the United States Government Grain Standards Act," that is, the "Handbook of Official Grain Standards of the United States" (exhibit 2). The term "grade" indicates determining the various percentages of different grains in a particular shipment, also percentages of damaged grain and all other factors that go into making a certain grade. A grade is determined by the various grains in a sample, also the degree of damage or freedom from damage. There is considerable trading in grain on the basis of sample. The witness has analyzed or inspected samples used in buying or selling grain many times over a period of 24 years and is familiar with the methods by which grains are graded or the various percentages of grains in a particular shipment are determined, including that by which the percentage of ergot in ergoty screenings is determined. He has performed that work himself many times, over a period of about 9 years. He has used the methods indicated in exhibits 3 and 4, which methods are recognized in the grain trade. The time consumed in determining the percentage of ergot in a carload of ergoty screenings, including the sampling and inspection, would be not more than 45

minutes. He described the process of sampling and inspection as follows:

To procure a sample you must enter a car with a probe, which is prescribed by the Federal Grain Standards Act. It's a brass probe with a double probe. The inside probe turns. Both probes are slotted. And as you push the probe into the grain, when you get it down to the proper depth in the car, to the bottom of the car, when you turn the probe, the inside probe, so that the slots match, and each slot then will let in the grain that they will hold. And then you close the slots and pull the probe out. And you must—the prescribed method is five probes to each car. That is, you have to probe the car in five different places. And then this sample is to be mixed together on what we call a boner-divider. And the sample is a uniform sample after it's been mixed three times through a boner-divider. Then it's ready for arbitration * * * "Arbitration" means to hand-pick, physically hand-pick the sample. And that's done with a forceps.

*       *       *       *       *       *       *

You generally—for bigger things like ergot the prescribed amount to use for your arbitrary sample is 250 grams. And when you have cut your sample down to 250 grams or somewheres about there, whatever it divides to—might be 300 grams—then you proceed to pick out the ergot by hand and weigh it and determine the percentage. For other grading you use lesser amounts of grain to start with.

The method described is in common use in the grain trade and has been for 24 years or longer. It is the method by which grains are bought and sold and, on the basis of this method, commercial settlement is made. Ergoty screenings are screenings with ergot in them. He has bought and sold both screenings and ergoty screenings. The latter are called ergoty screenings, or sometimes screenings with ergot in them, or screenings containing ergot. Screenings other than ergoty screenings are called screenings. The only difference between the two kinds is that ergoty screenings have a percentage of ergot. The United States Government Grain Standards Act allows up to three-tenths of 1 per centum of ergot in grain. Anything over three-tenths of 1 per centum is classified "ergoty" and that word "ergoty" must be added to and made part of that grade. Plain screenings with ergot in them are screenings. If they have ergot, they either state that the screenings are ergoty on the grade or just the word "screenings" as the grade, with the notation below of the percentage of ergot that is in the cargo or lot. There is a great difference in price between the two, depending upon the percentage of ergot. The price of a shipment of screenings is determined by the percentage of the ergot content.

On cross-examination, the witness admitted that the buying and selling of screenings containing ergot was a very small part of his business. Like the first witness, he stated that mixed feed oats are composed of screenings, wild oats, and, usually, some small percentage

of sound, cultivated oats and other grains. Feed oats could be bought and sold as screenings and are referred to also as feed oat screenings or oatey screenings. Mill oats are the same thing and are sometimes referred to as oatey screenings. Ergoty screenings are screenings, but are referred to as ergoty screenings or ergot screenings or screenings. The witness explained this last statement as follows:

> Sometimes the inspection department puts out a grade, and on that grade they will say "screenings" and down below they will make a notation "10 percent ergot" or "15 percent ergot," so that sometimes they are "screenings," sometimes they are "ergoty screenings," and sometimes they are "screenings ergoty."

There is always something to indicate that they have ergot in them. The Grain Standards Act makes that mandatory. If the percentage of ergot amounts to much over three-tenths of 1 per centum, it is difficult to sell it to the regular feed trade, the reason being that ergot is a poison, and it is not permissible in any amount in the feed grain. The witness sells the material after the ergot is removed, sells it as screenings, and on its value as screenings. If it contains over three-tenths of 1 per centum of ergot, the ergot must be removed. He has sold ergoty screenings to pharmaceutical houses and did inspecting for such houses of the screenings as he bought them.

On recross, he stated that the product remaining after the removal of the ergot is sold as screenings, as mixed feed oats, and as feed oats, all of which terms are interchangeable.

In plaintiff's exhibit 3, a pamphlet entitled "Grain Grading Primer," a publication of the United States Department of Agriculture, on pp. 42–3, we find the following:

### ERGOTY GRAIN

Ergot is a fungus disease that attacks cereal grains, principally rye and occasionally Durum wheat and barley.

Any dockage-free wheat, rye, or barley, as well as any oats, Feed oats, Mixed Feed oats, and Mixed Grain (with all of the foreign material included in the last four grains) which contains more than 0.3 percent of ergot is classified as Ergoty, and the word "Ergoty" must be added to, and made a part of, the grade designation.

Ergot is objectionable because it discolors the flour if milled with the grain. Ergot also contains poisonous compounds that may be injurious to man and animals; thus foods and millfeeds manufactured from ergoty grain are undesirable.

The regulations for the enforcement of the Federal Food, Drug, and Cosmetic Act provide that any flour or other manufactured cereal product that contains more than 0.1 percent of ergot shall .be considered to be adulterated. Consequently, as much as possible of the ergot should be removed from grain that contains ergot before the grain is converted into flour or feed.

**Determining percentage of ergot in wheat, rye, or barley.**—To determine the percentage of ergot in either wheat, rye, or barley, a representative portion of at least 250 grams should be taken from the dockage-free grain.

The ergot is picked out by hand and weighed, and the percentage of ergot is computed on the basis of the portion analyzed.

**Determining percentage of ergot in oats, Feed oats, Mixed Feed oats, or Mixed Grain.**—To determine the percentage of ergot in oats, Feed oats, Mixed Feed oats, or Mixed Grain, a representative portion of at least 250 grams should be taken from the original sample (all foreign material included). The ergot is picked out by hand and weighed, and the percentage of ergot is computed on the basis of the portion analyzed.

This court and the Court of Customs and Patent Appeals have had before them for determination upon numerous occasions the question of the segregation of mixtures of various grains and of different grades of certain grains, under section 507 of the Tariff Act of 1922 and its corresponding provision, section 508 of the Tariff Act of 1930. A majority of those cases involved a determination of whether the differing portions of the importations were readily ascertainable by customs officials.

In *United States* v. *Washburn*, 14 Ct. Cust. Appls. 243, T. D. 41874, the merchandise consisted of wheat and screenings, both of which commodities were specifically provided for in the Tariff Act of 1922, there involved. The court held that the two commodities were readily segregable, upon evidence that an inspector for the importer had sampled the shipment and found 2.7 per centum screenings by a simple operation, and that a licensed inspector, using a method approved by the Department of Agriculture, found 2.3 per centum screenings.

The case of *Rosenbaum Grain* v. *United States*, 60 Treas. Dec. 541, T. D. 45165, involved a shipment of mixed feed oats, 6.5 per centum of which consisted of sound cultivated oats, and the remainder of wild oats, other grains, and foreign material. It was held by the court that the official analysis, presumably made in accordance with the simple and well-accredited test set out in the United States Handbook of Official Grain Standards for determining the quality of screenings, showed 6.5 per centum of cultivated oats and that only that percentage of the importation was dutiable as cultivated oats.

In *California Flaxseed* v. *United States*, 55 Treas. Dec. 670, T. D. 43352, the merchandise consisted of flaxseed, mixed with screenings. The evidence showed that the respective amounts of flaxseed and screenings were readily ascertainable by the customs officials by means of analysis. Under authority of *Consolidated Elevator Co.* v. *United States*, 8 Ct. Cust. Appls. 267, T. D. 37536, and *United States* v. *Washburn-Crosby Co.*, 14 Ct. Cust. Appls. 243, T. D. 41874, it was held that the flaxseed and screenings were separate commodities and dutiable on the basis of the percentages shown by the analysis.

In *United States* v. *Brandenstein*, 17 C. C. P. A. (Customs) 480, T. D. 43941, it was held that milled rice and broken rice were segre-

gable, the respective quantities of each being readily ascertainable by the customs officers under the test prescribed by the Government, which was also employed in the trade and was simple and accurate.

In the case before us, the evidence shows that the quantities of ergot and screenings are easily ascertainable by methods prescribed by the United States government which are well recognized by the grain trade. Counsel agreed that the actual percentages as found by the United States Customs Laboratory were as follows:

| Entry No. | Ergot content |
|-----------|---------------|
| 5249–A | 5.8 per centum |
| 717–A | 34.6 per centum |
| 2109–A | 52.9 per centum |

We, therefore, sustain plaintiff's claim that the ergot and screenings are segregable and separately dutiable, the ergot being free under paragraph 1728 of the Tariff Act of 1930 and the remaining merchandise dutiable as screenings under paragraph 731 of the same act, as assessed, upon the basis of the above percentages.

Judgment will be rendered accordingly.