(C.D. 2472)

BORDER BROKERAGE CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 6, 1964)

*Lawrence & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*James F. O'Hara* and *Glenn E. Harris*, trial attorneys), for the defendant.

Before DONLON and RICHARDSON, Judges

DONLON, Judge: These cases were consolidated in Seattle for purposes of trial. The merchandise, which is described on the invoices as balsam tree seed, uncleaned spruce tree seed, uncleaned cedar tree seed, and uncleaned hemlock tree seed, was identified by plaintiff's witness, Mr. F. E. Manning. (R. 8.)

This merchandise was imported from Canada in 1959 and 1960, and was assessed with duty at the rate of 2 cents per pound, under paragraph 764 of the Tariff Act of 1930, as modified, as "Other garden and field seeds: Tree and shrub." The claim in the protests is as follows:

Tree seed should be assessed at 2¢ per pound on net weight under paragraph 764, and cone waste should be free of duty under paragraph 1722.

In protest amendments, it is alternatively claimed that cone waste or chaff should be dutiable at only 2½ per centum ad valorem under paragraph 731, as modified.

Mr. F. E. Manning, plaintiff's witness, is the president and owner of the Manning Seed Co., which imported the seed here in issue. He testified that Manning Seed Co. is a family business which was founded in 1871, in Astoria, then in Oregon territory, now the State of Oregon. Mr. Manning has been associated with the business from his youth. He became president in 1948. The company owns a number of seed extracting plants, three of which are located in British Columbia, one in Washington, one in Oregon, and one in Idaho. Mr. Manning visits these plants regularly; he sells seeds; and he visits customers.

According to Mr. Manning, prior to exportation from Canada to the United States, certain processes are applied to hemlock, spruce, cedar, and balsam cones in the company plants in British Columbia. The cones are brought to a kiln which operates at temperatures of approximately 110–120 degrees Fahrenheit. In this process, the cones are heated, so that they open. They then go into a thrashing machine,

which revolves fairly slowly. The cones go from the bottom of this machine to the top, and then drop down. This releases the seeds from the cones, and tears up the cone "so that you end up with a combination of seed and particles of the cone itself, and there's a little twig on the end of the cone which is in there also." There is no screening prior to importation, to separate the seeds from the other materials. The merchandise here was processed in the described manner, and it was imported in the condition Mr. Manning described.

After importation, the mixture is put through a clipper-cleaning machine, which takes out the easy-to-remove bulky material, which is larger or of a different shape or weight than the seed. The seed then goes through a de-winging process to remove the wings from the seed. Thereafter, the seed goes through a gravity separator and is brought to a quality control point where purity is checked. If the seed is less than 97 percent pure, it goes back for further cleaning. Material that is separated from the seeds is burned.

According to the witness, a record is always kept of the amount of seeds and the amount of other material separated from the seeds. He stated:

* * * It's a very open record because we run each group of seed through, whether it's imported or domestic, under a batch card. The batch card shows what went in, and our inventory becomes what came out, so that there's no question.

Q. Now, does it average out to a pretty even percentage, through all the years that you have been in this business?—A. Yes. It's very clean-cut. You can see from the record that we gave you it is over 60% woody material or parts of cones, and 40% the other way. It is very easy to see that from the figures.

The witness stated that the amount of "chaff" is usual in seeds of this kind, and it is not more than the usual quantity to be expected. He said that the separated material is not dirt, but consists of particles of cone that were ground up in the processing. It is waste, and it has no commercial value.

The mixture, in condition as imported, can be constructively segregated like any seed, by taking a sample and dividing it into seed and the trash, or woody, residue. This is done every day in the Quarantine Office, by which we understand Mr. Manning referred to the facility of the United States Department of Agriculture through which imported vegetable substances, such as this, are required to be cleared before they may be entered into the commerce of the United States. A representative sample is taken with a sampling rod, which is pushed into the sack, opened up, and shaken until it is filled. The sample is taken out, dumped on a table, the seeds are put on one side, and the trash on another. Each is weighed to get the percentage of weights. This gives a reasonable approximation of the amount of seed and the amount of other material in the shipment.

The witness stated that the merchandise covered by entry No. 05–2410, which does not refer to waste or chaff, did not consist of pure seeds. He based his answer on the fact that he had the figures on the pure seed in that shipment, and also on the fact that his firm does not have equipment in Canada to deliver pure seed.

On the record presented, plaintiff claims that the quantity of the tree seeds and of the broken bits of cone could have been readily ascertained by customs officials, and that the two commodities should have been classified separately. Defendant contends that the merchandise consists of seed and impurities, and that it must be treated as an entirety, subject to duty as seed, in view of the proviso in paragraph 763 of the Tariff Act of 1930 which states:

* * * *Provided*, That no allowance shall be made for dirt or other impurities in seed of any kind.

The other pertinent provisions of the tariff act are as follows:

[PAR. 764, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865, and T.D. 53877].

 Other garden and field seeds:
 Tree and shrub_____ 2¢ per lb.

PAR. 1722. Moss, seaweeds, and vegetable substances, crude or unmanufactured, and not specially provided for. [Free.]

[PAR. 731, as modified by the General Agreement on Tariffs and Trade, T.D. 51802]. Screenings, scalpings, chaff, or scourings of wheat, flaxseed, or other grains or seeds:

 Unground, or ground_____ 2½% ad val.

SEC. 508. COMMINGLING OF GOODS [as amended by the Customs Simplification Act of 1953].

(a) Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise cannot be readily ascertained by the customs officers (without physical segregation of the shipment or the contents of any entire package thereof), by one or more of the following means: (1) Examination of a representative sample, (2) occasional verification of packing lists or other documents filed at the time of entry, or (3) evidence showing performance of commercial settlement tests generally accepted in the trade and filed in such time and manner as may be prescribed by regulations of the Secretary of the Treasury, and if the consignee or his agent shall not segregate the merchandise pursuant to subsection (b), then the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof.

One of our difficulties is that counsel for the plaintiff, both at the trial and in their brief, refers to the material other than seed as screening, scalpings, chaff, or scourings, which is one of the alternative protest claims. It seems clear that the material is not screenings, scalpings, chaff, or scourings, within the meaning of the tariff act.

"Screenings" has been held to be a well-known article of commerce, having a distinct value. *Williamson* v. *United States*, 8 Ct. Cust. Appls. 277, T.D. 37538; *Pacific Vegetable Oil Corp.* v. *United States*, 15 Cust. Ct. 161, C.D. 964; *Universal Laboratories* v. *United States*, 35 Cust. Ct. 23, C.D. 1715. Scalpings, or mixed feed oats, consist of material derived from the cleaning of wheat, barley, rye, or flaxseed by machinery in a grain elevator. *James Richardson & Sons, Ltd.* v. *United States*, 12 Cust. Ct. 6, C.D. 823. The Summary of Tariff Information, 1929, states (p. 1218):

Sreenings, chaff, and scourings are by-products obtained by grain elevators, millers, and also from the farm thresher. They consist of foreign grains, under-developed kernels; seeds from weeds, pigeon grass, wild oats, wild buckwheat, etc. They are used principally for live stock and poultry feed, either directly or after going through various stages of separation, or after being mixed with molasses or other feeds.

The material in the instant case is not a by-product obtained in a grain elevator. It does not consist of foreign grains, seeds, or grasses. It has no commercial value. According to Mr. Manning, it consists of broken pieces of cone and twigs that are worthless.

Merchandise closely resembling that at bar was involved in *United States* v. *Amendola*, 5 Ct. Cust. Appls. 516, T.D. 35156. The court described it as follows (p. 517):

It appears from the testimony that the cones in question are imported from Italy in the condition in which they are when first taken from the tree, with the nuts attached under the imbricated leaves or scales of the cone. The cones with the nuts attached are bought and sold in the markets by the hundred. The cones are shattered into pieces as the best means of recovering the nuts, the broken pieces are burned up or thrown away as valueless, and the nuts are eaten "like peanuts." As stated above, it appears from the testimony that in the case of the present importation the nuts themselves constituted 20 per cent of the gross weight of the importation.

The court said that the joint importation of nuts and cones would not be entitled to free entry as crude vegetable substances, although the cones would be free if they were imported alone. It was held, however, that duty should not be assessed on the gross weight of the cones and nuts, taken together, but on the weight of the nuts alone, under paragraph 283 of the Tariff Act of 1909, which provided for nuts, shelled or unshelled, and which contained a proviso that no allowance should be made for dirt or other impurities in nuts of any kind. The court found that the cones were not shells of pine nuts, and stated:

It is equally improper to describe the cones as "dirt or other impurities in" the nuts. They are obviously not "dirt," nor do they respond to the description of "other impurities in" the nuts. In the case of the present importations the cones weigh four times as much as the nuts, and are more bulky than the

nuts in even a greater proportion. They can hardly be described as "impurities in" the nuts which they thus hold and carry. It is true that the cones and nuts are imported as entireties; nevertheless it is administratively practicable to ascertain the net weight of the nuts alone. At least there is nothing in the present record which contradicts the testimony of the importer to that effect. There seems, therefore, to be no reason why they should not be separated for duty purposes, and the nuts assessed alone, they being in fact the only dutiable portion of the importation. [P. 518.]

Other cases have held pine cones to be free of duty as crude vegetable substances. *Otto G. Mayer & Co.* v. *United States*, 2 Treas. Dec. 534, T.D. 20038; *Koeller-Struss Co.* v. *United States*, 58 Treas. Dec. 947, Abstract 12955. In *E. Berghausen Chemical Co.* v. *United States*, 60 Treas. Dec. 725, T.D. 45221, it was held that broken pieces of saparita-nut shells, imported in bulk, were classifiable as crude vegetable substances.

In *Consolidated Elevator Co.* v. *United States*, 8 Ct. Cust. Appls. 267, T.D. 37536, the court pointed out that the word "impurity" may and often does mean any matter not of the character of the principal matter, or it may signify some substance inherently impure or unsalable. In connection with a proviso in paragraph 212 of the Tariff Act of 1913, providing that no allowance should be made for dirt or other impurities in seeds, the court said:

* * * Undoubtedly such a provision as that we are considering would require denial of any allowance whatever for impurities, which, within the rule of ejusdem generis, were of like kind with those specifically enumerated. We are impressed, however, that this rule calls for a limitation of the impurities, allowance for which is proscribed, to such as correspond with the one named, at least in the essential particular of having no separate tariff status for dutiable purposes, and that the proviso should not be so construed as to abrogate the rule that where two or more articles subject to different tariff rates are present in an importation they may be separately assessed at the several rates provided for each, as was done in *United States* v. *Waterhouse* (1 Ct. Cust. Appls., 353; T.D. 31452), citing *United States* v. *Ranlett* (172 U.S. 133). * * * [P. 270.]

The woody residue here does not consist of dirt or any foreign matter; it weighs substantially more than the seeds and so cannot be considered as "impurities in" the seed; and it has separate tariff status as a crude vegetable substance. Therefore, under the cases cited, the mixture of seeds and woody residue may be separately classified for duty purposes. Inasmuch as we do not agree with defendant's contention that the woody residue is dirt or other impurities, we do not find any inconsistency between the ruling here and that in *Pacific Vegetable Oil Corp.* v. *United States, supra*, cited by defendant. In that case, the record showed that dirt and chaff were mingled with the imported seeds, and paragraph 763 was found to be applicable to that situation, on the record there. It is not applicable here, on the record before us.

Under section 508 of the Tariff Act of 1930, as amended, *supra*, whenever dutiable merchandise and merchandise that is free of duty are commingled, they may be separately classified, provided the quantity of each class may be readily ascertained by customs officials according to one or more of the methods specified in the statute, which include examination of a representative sample.

In the instant case, there is uncontradicted testimony that the quantity of each of the two classes of merchandise may be ascertained by examining and weighing the portions in a representative sample of each importation, and that this method is regularly used in the Quarantine Office. According to Mr. Manning, the records of his company over a period of years show that this type of merchandise consists, 60 percent of the woody material or parts of cones, and 40 percent of seeds. There is nothing in the record to contradict this evidence.[1]

In *United States* v. *Washburn-Crosby Co.*, 14 Ct. Cust. Appls. 243, T.D. 41874, samples of wheat and screenings were passed over a device called a "kicker," from which one witness determined that the merchandise consisted of 97.3 percent wheat and 2.7 percent screenings. Another witness testified that samples were taken by means of a probe, which was plunged into the grain, and from these it was determined that the amount of screenings was 2.3 percent. The court concluded (p. 247):

> We are convinced, from an examination of the record in the case at bar, that the respective amounts of screenings and wheat in the importation in question here were readily ascertainable by the customs officers. This being true, it was the duty of the customs officers to so ascertain them and return the goods for duty accordingly. Not having done so, the court below was right, upon this record, in rendering judgment ordering a reliquidation, and its judgment is therefore, *affirmed*.

See also *Universal Laboratories* v. *United States*, *supra*, where sampling was done with a probe and the sample hand-picked to separate ergot and screenings. The court there, stating the evidence showed that the quantities of ergot and screenings were easily ascertainable by methods prescribed by the United States Government, which were well recognized by the grain trade, held that the ergot was free of duty and the screenings dutiable, upon the basis of percentages found by the United States Customs Laboratory and agreed upon by counsel.

The evidence before us establishes that the tree seed and the woody residue are readily segregable by methods that are recognized by the

---

[1] While the official papers were not offered in evidence and we do not, therefore, deem them in evidence as proofs, there are notations on some of the invoices, apparently made by the examiner, that 60 percent of the gross weight consisted of crude vegetable substances.

# 60

United States Government, and that the weight of the tree seed constitutes 40 percent of the gross weight and that of the woody residue 60 percent thereof. Upon the basis of those percentages, we hold that the seed is dutiable at 2 cents per pound under paragraph 764 of the Tariff Act of 1930, as modified, and that the woody material is free of duty under paragraph 1722 of said tariff act, as a crude vegetable substance, not specially provided for.

To that extent, the protests are sustained. In all other respects and as to all other merchandise, the protests are overruled.

Judgment will be entered accordingly.